Yosina M. Lissebeck (State Bar No. 201654)
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Telephone: 619.400.0500
Facsimile: 619.400.0501
yosina.lissebeck@dinsmore.com

Sarah S. Mattingly (Ky. Bar 94257 – Admitted pro hac vice)
**DINSMORE & SHOHL LLP**
101 S. Fifth Street, Suite 2500
Louisville, KY 40202
Telephone: 859-425-1096
Facsimile: 502-585-2207
Sarah.mattingly@dinsmore.com

*Special Counsel to Richard A. Marshack,*
*Chapter 11 Trustee, for the Bankruptcy*
*Estate of the Litigation Practice Group*
*P.C. and Liquidating Trustee of the*
*LPG Liquidation Trust*

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE LITIGATION PRACTICE GROUP P.C.,<br><br>Debtor. | Case No. 8:23-bk-10571-SC<br><br>Chapter 11<br><br>Adv. Proc. No. 8:23-cp-01148-SC |
| RICHARD A. MARSHACK,<br>Chapter 11 Trustee,<br>Plaintiff,<br><br>v.<br><br>JGW SOLUTIONS LLC,<br>Defendant. | **DECLARATION OF SARAH S. MATTINGLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  November 26, 2024<br>Time:  11:00 A.M.<br>Judge: Hon. Scott C. Clarkson<br>Place:  Courtroom 5C<br>411 West Fourth Street<br>Santa Ana, California 92701 |

1

1       I, Sarah S. Mattingly, declare as follows:

2       1.    I am an attorney duly licensed to practice law by the State Bar of
3 Kentucky and admitted to practice before this Court by permission through Pro Hac
4 Vice. I am a partner of the law firm of Dinsmore & Shohl LLP, special counsel to
5 Richard A. Marshack, Chapter 11 Trustee for the bankruptcy estate of the debtor, The
6 Litigation Practice Group P.C. and Liquidating Trustee of the LPG Liquidation Trust
7 ("Trustee") and the plaintiff in the above-captioned adversary proceeding. I make this
8 declaration in support of *Plaintiff's Motion for Summary Judgment*. Unless stated
9 otherwise, I have personal knowledge of the facts contained in this declaration, and if
10 called upon to testify, I could and would testify competently thereto.

11       2.    On or about October 14, 2024, I reviewed the docket in this adversary
12 proceedings.

13       3.    On or about September 22, 2022, JGW, LPG and PurchaseCo80, LLC
14 entered into the Asset Purchase Agreement on September 22, 2022 ("Affiliate
15 Agreement"). A true and accurate copy of the Affiliate agreement is attached hereto
16 as **Exhibit A** and incorporated herein.

17       4.    A true and accurate copy of JGW's Responses to Trustee's Requests for
18 Admissions is attached hereto as **Exhibit B** and incorporated herein.

19       5.    On or about November 7, 2022, JGW entered into an Account
20 Receivable Purchase Agreement with Debtor ("ARPA 1"). A true and accurate copy
21 of ARPA 1 is attached here as **Exhibit C** and incorporated here.

22       6.    On or about November 17, 2022, JGW entered into an Account
23 Receivable Purchase Agreement with Debtor ("ARPA 2"). A true and accurate copy
24 of ARPA 2 is attached here as **Exhibit D** and incorporated here.

25       7.    On or about January 23, 2023, JGW entered into an Account Receivable
26 Purchase Agreement with Debtor ("ARPA 3"). A true and accurate copy of ARPA 3
27 is attached here as **Exhibit E** and incorporated here.

28 ///

8. On or about January 28, 2023, JGW entered into an Account Receivable Purchase Agreement with Debtor ("ARPA 4"). A true and accurate copy of ARPA 4 is attached here as **Exhibit F** and incorporated here.

9. On or about March 31, 2023, JGW entered into an Account Receivable Purchase Agreement with Debtor ("ARPA 5"). A true and accurate copy of ARPA 5 is attached here as **Exhibit G** and incorporated here.

10. The Defendant violated federal and state law by entering into ARPA 1, ARPA 2, ARPA 3, ARPA 4, and ARPA 5 (collectively, "ARPA Agreements").

11. According to Paragraph 4 through 9 of the Declaration, Debtors paid $805,245.12 pursuant to the ARPA Agreements.

12. According to Paragraph 3 of the Declaration, Debtors paid JGW $73,553.29 pursuant to the Affiliate Agreement.

13. A true and accurate copy of the Trustee's Responses to JGW's Requests for Admissions are attached hereto as **Exhibit H** and incorporated herein.

14. A true and accurate copy of the Trustee's Responses to JGW's Interrogatories are attached hereto as **Exhibit I** and incorporated herein.

15. A true and accurate copy of the Transaction History Detail is attached hereto as **Exhibit J** and incorporated herein.

16. A true and accurate copy of the 90-Day Transaction History Detail is attached hereto as **Exhibit K** and incorporated herein.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 14th day of October 2024 at Louisville, Kentucky.

Dated: October 14, 2024

Sarah S. Mattingly (pro hac vice)

3

**EXHIBIT "A"**

DocuSign Envelope ID: A3D9F4EF-54C6-4338-90DD-25BE863E69E9

Case 8:23-ap-01143-SC    Doc 48-2    Filed 11/20/24    Entered 11/20/24 14:39:18    Desc
Declaration of Sarah S. Mattingly    Page 5 of 135

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "***Agreement***") is entered into effective as of September 22, 2022 (the "***Effective Date***") by and among JGW Solutions LLC, a California LIMITED LIABILITY COMPANY ("***Seller***"), and PurchaseCo80, LLC, a Delaware limited liability company ("***Buyer***"). Each of Seller, LPG (defined below), and Buyer may also be referred to herein individually as a "***Party***" and collectively as the "***Parties***."

### RECITALS:

A.    Seller is engaged in the origination of accounts receivables from Litigation Practice Group, PC, a California professional corporation ("***LPG***"), representing an obligation of clients to pay Seller for services previously provided by Seller, in which LPG shall provide beginning on the Effective Date.

B.    Seller desires to sell to Buyer all right, title, and interest to the payments owing to Seller from the accounts listed on <u>Schedule 1.1</u>, and Buyer desires to purchase such right, title, and interest, all on the terms and subject to the conditions contained herein (the "***Transaction***").

### AGREEMENT:

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants of the Parties set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties do hereby mutually agree as follows:

## ARTICLE I
## PURCHASE AND SALE

1.1    <u>Sale of Assets</u>.  Subject to the terms and conditions of this Agreement, Seller will sell, convey, transfer and assign to Buyer, free and clear of any and all liabilities, pledges, mortgages, security interests, liens, charges, obligations, claims and other encumbrances whatsoever, whether absolute, accrued, contingent or otherwise, (collectively, "***Liens***"), and Buyer will purchase and acquire from Seller, all right, title and interest of Seller in and to the accounts receivable of Seller listed on <u>Schedule 1.1</u> (the "***Acquired Assets***").

1.2    <u>No Assumption of Liabilities</u>.  Seller hereby acknowledges and agrees that Buyer is not, in connection with this transaction or otherwise, assuming any expense, obligation, responsibility or liability of any nature whatsoever (including, without limitation, accrued, absolute, contingent or otherwise) of Seller, including, but not limited to, liabilities incurred in the ordinary course of business and existing as of the Effective Date or otherwise relating to Seller or LPG's operation of its business prior to the Closing, and all of such expenses, obligations, responsibilities and liabilities have been and are retained in all respects by Seller and LPG (collectively, the "***Unassumed Liabilities***").

## ARTICLE II
## PURCHASE PRICE AND PAYMENT

2.1    <u>Payment of Purchase Price</u>.

(a)    The aggregate purchase price for the Acquired Assets will be $5,952.80  (the "***Purchase Price***").

Case 8:23-ap-01148-SC    Doc 48-2    Filed 11/20/24    Entered 11/20/24 14:39:18    Desc
Declaration of Sarah S. Mattingly    Page 6 of 135

DocuSign Envelope ID: A2D9F4EF-54C6-4338-99DD-2BBE863F69E9

(b)      At Closing, Buyer will pay Seller by wire transfer, in the instructions listed on <u>Schedule 2.1</u>, an amount (the "***Cash Payment***") equal to the Purchase Price.

2.2      <u>Acknowledgement of Adequacy of Purchase Price</u>.  The Parties acknowledge that the Purchase Price (i) equals or exceeds the fair market value of the Acquired Assets, and (ii) constitutes reasonably equivalent value in exchange for the Acquired Assets.

2.3      <u>Allocation of Purchase Price</u>.  The Purchase Price will be allocated among the Acquired Assets in accordance with the requirements of Section 1060 of the Internal Revenue Code of 1986, as amended, based upon the residual method, valuing all identified assets, determining the amount to be allocated based upon the contract price, assigning to respective classes of assets—Class III – Market to Market Assets & Accounts Receivable—and adjusting for specific transaction costs, in a manner to be agreed upon by the Parties thirty (30) days following the Closing.  After the Closing, the Parties will make consistent use of the allocation, fair market value, and useful lives so agreed upon for all tax purposes and in all tax returns with the IRS in respect thereof.  The Parties hereby covenant and agree not to take a position on any tax return, including Form 8594, before any governmental agency charged with the collection of an income tax, or in any judicial proceeding that is in any way inconsistent with the allocation so agreed upon. In the event that the Parties are unable to agree on the allocation described above, then the Parties hereby agree to attend mediation and participate therein in good faith prior to taking any other action provided herein or by applicable law to enforce this Agreement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller and LPG represent and warrant to Buyer, as of the Effective Date and as of the Closing Date, as follows:

3.1      <u>Seller Organization; Affiliation of LPG</u>.  Seller is a LLC duly organized, validly existing and in good standing under the laws of the State of CA, and has the requisite power to carry on the operations of the business of Seller as now conducted. With respect to Seller, LPG directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, Seller. For purposes of this <u>Section 3.1</u>, "<u>control</u>," when used with respect to Seller, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of Seller, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "<u>controlling</u>" and "<u>controlled</u>" shall have correlative meanings.

3.2      <u>LPG Organization</u>.  LPG is a professional corporation duly organized, validly existing and in good standing under the laws of the State of California, and has the requisite power to carry on the operations of the business of LPG as now conducted.

3.3      <u>Authority</u>.  Seller and LPG have the power and authority to execute, deliver and perform all of their obligations, covenants and agreements contained in this Agreement and all documents, instruments and other writings to be executed and/or delivered by them pursuant to this Agreement.

3.4      <u>Enforceability</u>.  This Agreement constitutes, and the other documents to be executed and delivered by Seller hereunder will constitute when executed and delivered by them, (assuming the due authorization, execution and delivery by the other parties hereto and thereto) legal, valid and binding obligations of Seller and LPG enforceable against them in accordance with their respective terms.

3.5      <u>Title to Assets; Encumbrances</u>.  Seller has good, valid and indefeasible title to all of the Acquired Assets.  All of the Acquired Assets are free and clear of any Lien.

3.6     Litigation.  There is no litigation or proceeding, in law or in equity, and there are no proceedings before any commission or other administrative authority, pending or threatened, against Seller or LPG with respect to the consummation of the Transaction or the Acquired Assets.

3.7     Books and Records.  The books of account and other records of Seller with respect to its operations and the Acquired Assets are current, complete and correct and have been maintained in accordance with sound business practices.

3.8     Third Party Consents; Licenses.  No third party (including, without limitation, governmental authorities) consents, licenses or permits are required in connection with the operation of the business of Seller, or the sale of the Acquired Assets pursuant to this Agreement.

3.9     No Violation.  The execution, delivery and performance of this Agreement by Seller and the consummation of the Transaction: (i) do not conflict with and will not conflict with, or result in or will result in a breach of, or constitute or will constitute a default (or an event which, with or without notice or lapse of time, or both, would constitute a default) under, any of the terms, conditions or provisions of any material agreement, instrument or obligation to which Seller or LPG is a party or by which any of them is bound; and (ii) do not violate and will not violate, in any material respect, any order, writ, injunction, decree, statute, rule of regulation applicable to Seller or LPG.

3.10    Legal Violations.  Seller and LPG are in full compliance with all applicable laws, ordinances and governmental regulations and the uses and operations that the business of Seller is conducting are in full compliance with all applicable laws, ordinances and governmental regulations, including the creation and collection of the Acquired Assets.  Seller has not received any notice from any governmental or quasi-governmental authority having jurisdiction over them asserting that they are in violation of any applicable financial laws, ordinances or regulations, or any legal or other requirements.

3.11    Accounts Receivable.  The Acquired Assets: (a) have arisen from bona fide transactions entered into by Seller involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice; (b) constitute only valid, undisputed claims of Seller not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of business consistent with past practice; (c) were created in accordance with all applicable laws and professional ethics pursuant to a validly existing and enforceable engagement letter for services between Seller and the accounts listed on Schedule 1.1; and (d) Seller has received at least one (1) payment in full from all accounts listed on Schedule 1.1.

3.12    Taxes.  Seller and LPG have filed all returns of income taxes required to be filed by it and all returns of other taxes required to be filed by it and has paid or provided for all taxes shown to be due on such returns (whether or not shown on or reportable on such returns) and with respect to any period prior to the Effective Date.  All such returns and reports filed are true, correct and complete in all material respects.

3.13    No Material Adverse Change.  There has not been any material adverse change in the business, operations, properties, prospects, assets, or condition of Seller or LPG, and no event has occurred or circumstance exists that may result in such a material adverse change.

3.14    Right of First Offer.        Seller and LPG grant to the Buyer a right of first offer to purchase any cash flow stream representing an interest in customer payments for debt validation services owned now, or later acquired by, Seller. Seller shall present Buyer with a written list of cash flows for consideration to be sold by Seller, which shall be presented to Buyer without price markups and on the same terms as originally presented by LPG. Buyer shall have five (5) days after receipt of such list to accept or decline purchase of such cash flows. Should Buyer decline any presented cash flow stream, it may be sold to third-parties for a

DocuSign Envelope ID: A9D9F4EF-54C6-4338-99DD-25BE863E69E9

period of thirty (30) days on identical economic terms as were presented to Buyer. After the thirty (30)-day period or upon any change in economic terms of the offering, the Buyer's rights under this Section 3.14 shall be renewed as to such cash flow.

3.15    <u>Disclosure</u>.  Seller has provided Buyer with all the information Buyer has requested for deciding whether to acquire the Acquired Assets.  No representation or warranty of Seller contained in this Agreement contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller, as of the Effective Date and as of the Closing Date, as follows:

4.1    <u>Organization</u>.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

4.2    <u>Authority</u>.  Buyer has the requisite power and authority to execute, deliver and perform all of its obligations, covenants and agreements contained in this Agreement and all documents, instruments and other writings to be executed and/or delivered by Buyer pursuant to this Agreement.

4.3    <u>Enforceability.</u>  This Agreement constitutes, and the other documents to be executed and delivered by Buyer hereunder will constitute when executed and delivered by Buyer, (assuming the due authorization, execution and delivery by the other parties hereto and thereto) legal, valid and binding obligations of Buyer enforceable against it in accordance with their respective terms.

## ARTICLE V
## PRE-CLOSING COVENANTS

5.1    <u>General</u>.  Between the Effective Date and the Closing Date each of the Parties will use its reasonable best efforts to take all action and to do all things necessary in order to consummate and make effective the Transaction (including satisfaction, but not waiver, of the closing conditions set forth in this Agreement), including, without limitation, compliance with and observance of the terms and conditions set forth in this Article V.

5.2    <u>Notices and Consents</u>.  Seller and LPG will make or give, as the case may be, any filings or notices to third parties, and they will use their reasonable best efforts to obtain any third-party consents required or otherwise necessary to be obtained by them in connection with the consummation of the Transaction.

5.3    <u>Preservation of Business</u>.  Seller will keep the Acquired Assets and its business substantially intact, including its present operations, working conditions, and relationships with lessors, licensors, suppliers, customers, and employees.

5.4    <u>Notice of Developments</u>.  Each Party will give prompt written notice to the other Party of any material adverse development causing a breach of any of its own representations and warranties in Articles III and Article IV hereof; *provided, however*, that no such disclosure will be deemed to amend or supplement the Schedules attached hereto or to prevent or cure any misrepresentation, breach of warranty, or breach of covenant by such Party.

DocuSign Envelope ID: A3D9F4FF-64C6-433S-99DD-25BE863E69E9

5.5     <u>Exclusivity</u>.  Seller or LPG will not: (i) solicit, initiate, or encourage the submission of any proposal or offer from any third party relating to the acquisition of the Acquired Assets, or (ii) participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in, or facilitate in any manner any effort or attempt by any third party to do or seek any of the foregoing.

**ARTICLE VI**
**CONDITIONS TO CLOSING; CLOSING**

6.1     <u>Conditions Precedent to Obligations of Buyer</u>.  Unless otherwise waived by Buyer, the obligations of Buyer to consummate the Transaction pursuant to this Agreement are subject to satisfaction of the following conditions precedent on or before the Closing Date:

(a)     the representations and warranties of Seller set forth in this Agreement shall be true and correct at and as of the Closing Date;

(b)     Seller and LPG shall have performed and complied with all of their respective covenants hereunder through the Closing;

(c)     Buyer shall be satisfied, in its sole discretion, with the results of its due diligence investigation into the Acquired Assets and the operations of Seller;

(d)     Seller shall have executed, acknowledged (where appropriate) and delivered all documents and instruments required hereunder to be delivered by them at or prior to Closing, including, but not limited to, the documents set forth in Section 6.4; and

(e)     there shall not have been, since the Effective Date, any material adverse change in the businesses, operations, properties, prospects, assets, or condition of Seller or LPG.

6.2     <u>Conditions Precedent to Obligations of Seller</u>.  Unless otherwise waived by Seller, the obligations of Seller to consummate the Transaction pursuant to this Agreement are subject to satisfaction of the following conditions precedent on or before the Closing Date:

(a)     the representations and warranties of Buyer set forth in this Agreement shall be true and correct at and as of the Closing Date;

(b)     Buyer shall have performed and complied with all of its covenants under this Agreement through the Closing; and

(c)     Buyer shall have executed, acknowledged (where appropriate) and delivered all documents and instruments required hereunder to be delivered by it at or prior to Closing, including, but not limited to, the documents set forth in Section 6.5.

6.3     <u>Closing</u>.   Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, the closing of the Transaction (the "***Closing***") will take place upon the execution and delivery of this Agreement and the documents listed in Section 6.4; or at such other date and place as the Parties may determine (the "***Closing Date***").

6.4     <u>Closing Deliveries of Seller</u>.   At the Closing, Seller will deliver to Buyer: (i) a bill of sale, assignment and assumption agreement, conveying all of the Acquired Assets, duly executed by Seller substantially in the form listed in <u>Schedule 6.4</u>; and (ii) such other documents as Buyer may reasonably request for the purpose of facilitating the consummation or performance of the Transaction.

DocuSign Envelope ID: A3D9F4EF-54C6-4338-90DD-25BE863569E9

6.5    Closing Deliveries of Buyer.  At the Closing, Buyer will deliver to Seller: (i) the Cash Payment; (ii) the bill of sale, assignment and assumption agreement described in Section 6.4, duly executed by Buyer substantially in the form listed in Schedule 6.4; and (iii) such other documents as Seller may reasonably request for the purpose of facilitating the consummation or performance of the Transaction.

**ARTICLE VII**
**POST-CLOSING COVENANTS**

7.1    Confidentiality.

(a)    Seller agrees not to disclose or permit the disclosure of any of the terms of this Agreement or of any other confidential, non-public or proprietary information relating to the Buyer or the business of the Buyer or any subsidiary thereof (collectively, "***Confidential Information***"); provided that such disclosure may be made (a) to any person who is a member, partner, officer, investor, director or employee, directly or indirectly, of Seller or counsel to, or accountants of, Seller solely for their use and on a need-to-know basis, (b) with the prior consent of the Buyer, (c) subject to the next paragraph, pursuant to a subpoena or order issued by a court, arbitrator or governmental body, agency or official, or (d) to any governmental or regulatory authority, body or agency pursuant to applicable laws, rules or regulations as reasonably determined by the Seller.

(b)    In the event that Seller shall receive a request to disclose any Confidential Information under a subpoena or order or examination, Seller shall to the extent legally practicable (a) promptly notify Buyer, (b) consult with Buyer on the advisability of taking steps to resist or narrow such request, and (c) if disclosure is required or deemed advisable, cooperate with Buyer in any attempt it may make to obtain an order or other assurance that confidential treatment will be accorded the Confidential Information that is disclosed.

(c)    Notwithstanding the preceding two paragraphs of this Section 7.1, neither the Seller nor LPG shall issue or publish any information about the formation or existence of the Buyer without the approval of Buyer.

7.2    Payment of All Taxes Resulting From Sale of Acquired Assets.  Seller will pay in a timely manner all taxes assessed by any taxing authority resulting from or payable in connection with the sale of the Acquired Assets pursuant to this Agreement.

7.3    Joint Post-Closing Covenant of the Parties.  The Parties jointly covenant and agree that, from and after the Closing, they will each use commercially reasonable efforts to cooperate with each other in connection with any action, suit, proceeding, investigation or audit of the other relating to (i) the preparation of an audit of any tax return of Seller for all periods prior to or including the Closing, and (ii) any audit of Buyer and/or any audit of Seller with respect to the sales, transfer and similar taxes imposed by the laws of any state or political subdivision thereof, relating to the Transaction.  In furtherance hereof, the Parties further covenant and agree to promptly respond to all reasonable inquiries related to such matters and to provide, to the extent reasonably possible, substantiation of transactions and to make available and furnish appropriate documents and personnel in connection therewith.  All costs and expenses incurred in connection with this Section 7.3 will be borne by Seller and LPG.

7.4    Customer and Other Business Relationships.  After the Closing, Seller will cooperate with Buyer, in its efforts to continue and maintain for the benefit of Buyer those business relationships of Seller existing prior to the Closing and relating to the Acquired Assets as operated by Buyer after the Closing, including relationships with lessors, employees, regulatory authorities, licensors, customers, suppliers and others. Seller will not take any action that would tend to diminish the value of the Acquired Assets after the Closing

DocuSign Envelope ID: A3D9F4EF-54C6-4338-99DD-25BE863F69E9

or that would interfere with the business as operated by Buyer after the Closing, including disparaging the name or business of Buyer.

7.5    <u>Fees and Expenses</u>.  Except as otherwise expressly provided herein, each Party hereto will pay its own legal, accounting and other fees, costs and expenses incurred by such Party in connection with the negotiation of this Agreement and the consummation of the Transaction.

7.6    <u>Substitution of LPG</u>. Buyer, in its sole discretion, may appoint an alternate servicer for the Acquired Assets to substitute for LPG.

7.7    <u>Further Assurances</u>.  After the Closing Date, the Parties will cooperate reasonably with each other and with their respective representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, and will (i) furnish upon request to each other such further information, (ii) execute and deliver to each other such other documents, and (iii) do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the Transaction.

**ARTICLE VIII**
**SURVIVAL; INDEMNIFICATION**

8.1    <u>Representations and Warranties to Survive</u>.  The representations and warranties made by the Parties in this Agreement will survive the execution and delivery of this Agreement until this Agreement is terminated by a mutual written instrument executed by the Parties.

8.2    <u>Indemnification by Seller and LPG</u>.  Seller and LPG will indemnify and hold harmless Buyer and its members, managers, officers, employees and agents from, against, and in respect of, any loss, liability, claim, demand, or expenses, including, without limitation, reasonable attorneys' fees and expenses (all of the foregoing, collectively, "***Losses***") arising out of or resulting from any of the following:

(a)    Any inaccuracy in or breach of any representation or warranty of Seller or LPG in this Agreement or any other agreement or document executed and delivered by Seller pursuant to this Agreement;

(b)    Any breach of or failure to fulfill any agreement or covenant of Seller or LPG under this Agreement or under any other agreement or document executed and delivered by Seller or LPG pursuant to this Agreement;

(c)    any Tax claim asserted against Buyer with respect to any taxes relating to the Acquired Assets or the operations of Seller or LPG's business attributable to periods prior to the Closing; and

(d)    Any and all actions, suits, proceedings, demands, assessments, judgments, reasonable and necessary costs and legal and other expenses incident to any of the foregoing.

8.3    <u>Indemnification by Buyer</u>.  Buyer will indemnify and hold harmless Seller from, against, and in respect of, any Losses arising out of or resulting from any of the following:

(a)    Any inaccuracy in or breach of any representation or warranty of Buyer in this Agreement or any other agreement or document executed and delivered by Buyer pursuant to this Agreement;

(b)    Any breach of or failure to fulfill any agreement or covenant of Buyer under this Agreement or under any other agreement or document executed and delivered by Buyer pursuant to this Agreement; and

(c)     Any and all actions, suits, proceedings, demands, assessments, judgments, reasonable and necessary costs and legal and other expenses incident to any of the foregoing.

All costs and expenses incurred in connection with this Section 8.3 will be reimbursed to Buyer by Seller and LPG.

8.4     <u>Indemnity Procedures</u>.  In case any claim, demand or action will be brought by any third party against a Party entitled to indemnity under this Article VIII, such Party will promptly notify the other Party from whom indemnity is sought in writing and the indemnifying Party will assume the defense thereof, including the employment of counsel.  In addition, in case a Party will become aware of any facts which might result in any such claim, demand or action, such Party will promptly notify the other Party who would be obligated to provide indemnity hereunder with respect to such claim, demand or action, and such other Party will have the right to take such action as it or they may deem appropriate to resolve such matter. Seller, on the one hand, and Buyer, on the other hand, will each make available to the indemnifying Party any non-privileged documents, materials and information in its possession that may be necessary to the defense of any such claim, demand or action.  The indemnified Party will have the right to employ separate counsel in any such action and to participate in the defense thereof, but the fees and expenses of such counsel will be at the expense of such indemnified Party, unless the employment of such counsel has been specifically authorized in writing by the indemnifying Party or unless the indemnifying Party fails to assume and diligently pursue the defense as required above.  The indemnifying Party will not be liable for any settlement of any action effected without its written consent, but if settled with the written consent of the indemnifying Party or if there will be a final judgment for the plaintiff in any such action, the indemnifying Party will indemnify and hold harmless the indemnified Party from and against any loss or liability by reason of such settlement or judgment.  Notwithstanding anything herein to the contrary, the indemnifying Party will not, without the written consent of the indemnified Party, settle or compromise any such action or claim or consent to the entry of any judgment in respect of any such action or claim which does not include as an unconditional term thereof the giving by the claimant to the indemnified Party of an unconditional release from all liability with respect to such action or claim.

# ARTICLE IX
## MISCELLANEOUS

9.1     <u>Notices</u>.  All notices and other communications under this Agreement must be in writing and will be deemed to have been duly given if delivered personally, sent by facsimile or mailed, by certified mail, return receipt requested, first-class postage prepaid, to the Parties at the addresses listed on the signature page(s) of this Agreement or such other addresses as will be furnished by like notice by such Party.  All notices and other communications required or permitted under this Agreement that are addressed as provided in this Section 9.1 will (i) if delivered personally, be deemed given upon delivery, (ii) if delivered by facsimile, be deemed delivered when confirmed, and (iii) if delivered by mail in the manner described above, be deemed given upon receipt.

9.2     <u>Expenses</u>.  Except as otherwise provided in this Agreement, all legal and other costs and expenses incurred in connection with this Agreement and the Transaction will be paid by the Seller and LPG. Any costs and expenses incurred by Buyer in connection with this Agreement and the transaction will be reimbursed by Seller and LPG.

9.3     <u>Successors and Assigns</u>.  This Agreement will not be assignable by Seller or LPG without the prior written consent of the Buyer.  This Agreement may be assigned by Buyer in its sole discretion. This Agreement will inure to the benefit of and be binding upon the Parties, and their successors and permitted assigns.

DocuSign Envelope ID: A3D9F4EF-64C6-4338-90DD-2BBE863E69E9

9.4     Entire Agreement; Amendment; Waiver.   This Agreement and the other instruments and agreements referred to herein embody the entire agreement of the Parties with respect to the subject matter hereof and supersede all prior agreements.  This Agreement may be amended, and any provision hereof waived, but only in writing signed by the Party against whom such amendment or waiver is sought to be enforced.  A waiver on one occasion will not be deemed to be a waiver of the same or any other breach on a future occasion.

9.5     Severability.  Any term or provision of this Agreement which is held to be invalid or unenforceable will be ineffective only to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement.  If any restriction or limitation in this Agreement is found by a court of competent jurisdiction to be unreasonable, onerous or unduly restrictive, such restriction or limitation will remain effective to the maximum extent permissible within reasonable bounds.

9.6     Captions.  The captions herein are inserted for convenience or reference only will be ignored in the construction or interpretation hereof.

9.7     Submission to Jurisdiction. To the extent a dispute is not resolved in arbitration as set forth in Section 9.9 (the "***Arbitration Agreement***"), the Parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the Western District of Texas, Austin Division. Each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding that is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice or other document by registered mail to the address set forth in Section 9.9 shall be effective service of process for any suit, action or other proceeding brought in any such court.

9.8     WAIVER OF JURY TRIAL; ARBITRATION.

(a)     EACH PARTY HERETO HEREBY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(b)     Binding Arbitration.

(i)                          This Section 9.9(b) shall be referred to as the "***Arbitration Agreement***." Upon demand of any Party, whether made before or after institution of any judicial proceeding, any dispute, claim or controversy arising out of, connected with or relating to this Agreement ("***Disputes***")[1], between or among the Parties hereto, related third parties, and the Parties' respective employees, agents, representatives, affiliates, beneficiaries, related entities and assigns, shall be resolved by binding arbitration as provided herein.  Institution of a judicial proceeding by a party does not waive the right of that party to

---

[1]        The following is not covered under this Arbitration Agreement: disputes or any portion thereof that an applicable federal statute expressly states cannot be arbitrated or cannot be the subject of a pre-dispute arbitration agreement.

DocuSign Envelope ID: A2D9F4EF-54C6-4338-90DD-2BBE863569E9

demand arbitration hereunder.  This Arbitration Agreement is intended to be as broad as legally permissible.
Disputes may include, but are not limited to, tort claims, counterclaims, claims arising from ancillary
Agreements or related-party agreements executed in the future, disputes as to whether a matter is subject to
arbitration, or claims concerning any aspect of the past, present or future relationships arising out of or
connected with this Agreement.  The Arbitrator, and not any federal, state, or local court or agency, shall
have exclusive authority to resolve any dispute relating to the validity, scope, applicability, enforceability,
or waiver of this Arbitration Agreement including, but not limited to, any claim that all or any part of this
Arbitration Agreement is void or voidable.  The obligation to arbitrate any Dispute will survive the
satisfaction in full of all obligations under this Agreement and the termination of this Agreement, any
Ancillary Agreements, and/or any Related-Party Agreement for any reason.  The parties hereto do not waive
any applicable federal or state substantive law except as provided herein.  A judgment upon the award may
be entered in any court having jurisdiction.

(ii)                            This Arbitration Agreement is governed by the FAA (9 U.S.C. § 1 et seq.).
Unless otherwise agreed in writing by the parties, and notwithstanding any conflicting choice of law
provision in any of the agreements between the Parties, Delaware law shall control the interpretation,
application, and enforcement of this Agreement; provided, however, the Federal Arbitration Act will be
applied to the Arbitration Agreement.  In reaching any determination or award, the Arbitrator shall apply
the substantive laws of the State of Delaware and the applicable laws of the United States of America,
without giving effect to any principles of conflict of laws under the laws of the State of Delaware, to all
Disputes covered by this Arbitration Agreement.  Any arbitration proceeding will be conducted by the
American Arbitration Association (the "AAA"), or such other administrator as the parties shall mutually
agree upon.  Any arbitration proceeding shall be conducted in accordance with the AAA Commercial
Arbitration Rules, including the AAA Emergency Procedures for Protection,  unless the claim or
counterclaim is at least one million dollars ($1,000,000) exclusive of claimed interest, arbitration fees and
costs, in which case the AAA's optional procedures for large, complex commercial disputes shall also apply
(the commercial dispute resolution procedures and the optional procedures for large, complex commercial
disputes to be referred to, as applicable, as the "*Arbitration Rules*").  Any arbitration shall proceed in a
location in Austin, Texas selected by the AAA.  The expedited procedures set forth in Sections E-1 through
E-10, et seq. of the Arbitration Rules shall be applicable to claims of less than one million dollars
($1,000,000).  All applicable statutes of limitations shall apply to any Dispute.  Either party may file
dispositive motions, including without limitation a motion for summary judgment, and the Arbitrator(s)
will apply the standards governing such motions under the Federal Rules of Civil Procedure. Each Party
may take the deposition of four individual fact witnesses and any expert witness designated by another
Party. Each Party also may propound requests for production of documents and ten (10) interrogatory
requests to the other Party. And, each Party shall have the right to subpoena witnesses and documents for
discovery or the arbitration hearing, including testimony and documents relevant to the case from third
parties, in accordance with any applicable state or federal law (including, without limitation, pursuant to
California Code of Civil Procedure § 1283.05). Additional discovery may be conducted by mutual
stipulation, and the Arbitrator(s) will have exclusive authority to entertain requests for additional discovery,
and to grant or deny such requests, based on the Arbitrator(s)'s determination whether additional discovery
is warranted by the circumstances of a particular case.  If there is any inconsistency between the terms
hereof and the Arbitration Rules, the terms and procedures set forth herein shall control.  Subject to
applicable law as determined by the Arbitrator(s), any party who fails or refuses to submit to arbitration
following a demand by any other Party shall bear all costs and expenses incurred by such other Party in
compelling arbitration of any Dispute.  Notwithstanding anything in the foregoing to the contrary, any
arbitration proceeding demanded hereunder shall begin within ninety (90) days of the appointment of the
Arbitrator(s) and shall be concluded within one hundred and twenty (120) days after such appointment,
unless otherwise mutually agreed in writing by the Parties.  These time limitations may not be extended
unless a Party hereto shows cause for extension and then such extension shall not exceed a total of sixty
(60) days, unless otherwise mutually agreed in writing by the Parties.

DocuSign Envelope ID: A3D9F4EF-54C6-4338-99DD-25BE863569E9

(iii)                                        Any arbitration proceeding in which the amount in controversy is five million dollars ($5,000,000) or less will be decided by a single arbitrator who shall not render an award of greater than five million dollars ($5,000,000) (the "Arbitrator").  Any dispute in which the amount in controversy exceeds five million dollars ($5,000,000) shall be decided by majority vote of a panel of three arbitrators (the "Arbitrators").

(iv)                                        The Arbitrator(s) must have at least ten (10) years of relevant legal experience as an attorney or a judge and be knowledgeable in the subject matter of the dispute.  The Parties shall select the Arbitrator(s) by mutual agreement.  If the Parties are unable to mutually select an arbitrator, the Arbitrator(s) shall be selected as follows:

(a)     To the extent the arbitration is conducted by a single arbitrator (as set forth above), AAA will give each party a list of nine (9) arbitrators (who are subject to the qualifications listed above) drawn from its panel of arbitrators. Each Party will have ten (10) calendar days to strike all names on the list it deems unacceptable. If only one common name remains on the lists of all Parties, that individual will be designated as the Arbitrator. If more than one common name remains on the lists of all Parties, the Parties will strike names alternately from the list of common names by telephone conference administered by AAA, with the claimant to strike first until only one remains. If no common name remains on the lists of all parties, AAA will furnish an additional list of nine (9) arbitrators from which the Parties will strike alternately by telephone conference administered by AAA, with the claimant to strike first, until only one name remains. That person will be designated as the Arbitrator. If the individual selected cannot serve, AAA will issue another list of nine (9) arbitrators and repeat the alternate striking selection process.

(b)     To the extent the arbitration is conducted by a panel of three arbitrators (as set forth above), AAA will give each Party a list of twenty-seven (27) arbitrators (who are subject to the qualifications listed above) drawn from its panel of arbitrators. Each Party will have ten (10) calendar days to strike all names on the list it deems unacceptable. Any common names remaining will be designated as the Arbitrators.  To the extent more than three common names remains on the lists of all parties, the Parties will strike names alternately from the list of common names by telephone conference administered by AAA, with the claimant to strike first until only three remain. If less than three common names remain on the lists of all Parties, AAA will furnish an additional list of arbitrators (9 for each arbitrator that remains to be selected) from which the Parties will strike alternately by telephone conference administered by AAA, with the claimant to strike first, until the number of arbitrators needed to comprise the three-arbitrator panel remain. Those persons will be designated as the Arbitrators. If any individual selected cannot serve, AAA will issue another list of nine (9) arbitrators and repeat the alternate striking selection process.

(v)                                        Notwithstanding the preceding binding arbitration provisions, the Parties hereto preserve, without diminution, certain remedies that such persons may employ or exercise freely, either alone, in conjunction with or during a Dispute.  Each such person shall have and hereby reserves the right to proceed in any court of proper jurisdiction or by self-help to exercise or prosecute the following remedies, as applicable:  (A) all rights to foreclose against any real or personal property or other security by exercising a power of sale granted in any agreement or under applicable law or by judicial foreclosure and sale, including a proceeding to confirm the sale, (B) all rights of self-help including peaceful occupation of property and collection of rents, set off, and peaceful possession of property, (C) obtaining provisional

DocuSign Envelope ID: A9D9F4EF-54C6-433S-99DD-25BE863E69E9

or ancillary remedies including injunctive relief, sequestration, garnishment, attachment, appointment of receiver and in filing an involuntary bankruptcy proceeding, and (D) when applicable, a judgment by confession of judgment.  Preservation of these remedies does not limit the power of an arbitrator to grant similar remedies that may be requested by a party in a Dispute.

(vi)                              The Parties agree there will be no right or authority for any dispute to be brought, heard or arbitrated as a class, collective and/or consolidated action (the "Class Action Waiver"). Nor shall any Arbitrator have the authority to hear or arbitrate any such dispute, regardless of any other language in this Arbitration Agreement, or any provision of any of the rules or procedures of the AAA that might otherwise apply including, without limitation, the AAA Supplemental Rules for Class Action Arbitration.  Notwithstanding the broad delegation to the Arbitrator(s) to resolve arbitrability disputes, no Arbitrator shall have the right to interpret the extent, applicability and/or enforceability of this Class Action Waiver; rather, any issue or dispute as to whether this Agreement permits such class, collective and/or consolidated action arbitration shall be resolved and/or interpreted solely by a court of competent jurisdiction.  This Class Action Waiver shall be severable from this Arbitration Agreement if there is a final judicial determination that the Class Action Waiver is invalid, unenforceable, unconscionable, void or voidable.  In such instances, the class or collective action must be litigated in court—not in arbitration.

(vii)                             Other than as set forth in the Class Action Waiver, if any provision of this Arbitration Agreement is adjudged to be invalid, unenforceable, unconscionable, void or voidable, in whole or in part, such adjudication will not affect the validity of the rest of the Arbitration Agreement; all remaining provisions will remain in effect.

9.9      Drafting.  Each of the Parties acknowledges that it was actively involved in the negotiation and drafting of this Agreement and that no law or rule of construction will be raised or used in which the provisions of this Agreement will be construed in favor or against any Party because one Party is deemed to be the author thereof.

9.10     Counterparts.  This Agreement, and any amendments hereto, may be executed by facsimile signature and in multiple counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.

[Remainder of Page Intentionally Left Blank]

DocuSign Envelope ID: ABD9F4FF-54C6-4338-99DD-25BF863E69E9

IN WITNESS WHEREOF, this Agreement has been executed on behalf of each of the Parties as of the Effective Date set forth above.

**SELLER:**

JGW Solutions LLC, a California Limited Liability Company

By:  *Jon Jenkins*
Name:  Jon Jenkins
Title:    CEO

Address of Seller:

60 PALATINE APT 215
Irvine, CA 92612

**BUYER:**

PURCHASECO80, LLC, a Delaware limited liability company

By:       Litigation Practice Group, PC, its manager

By:  *Daniel S March*
Daniel S. March, *Managing Shareholder*

By:       OHP – LPG, LP, member

By:       Old Hickory Fund I GP, LLC, its general partner

By:  *Adam Blum*
Adam C. Blum, *Manager*

**ACKNOWLEDGED AND AGREED TO:**

**LPG:**

Litigation Practice Group, PC, a California professional corporation

By:  *Daniel S March*
Daniel S. March, *Managing Shareholder*

SIGNATURE PAGE
TO
ASSET PURCHASE AGREEMENT

DocuSign Envelope ID: A9D9F4FF-54C6-433C-90DD-25BE863F69E9

<u>Schedule 1.1</u>

**Accounts Receivable**

See attached

DocuSign Envelope ID: A9D9F4EF-54C6-4338-99DD-25BE863E69E9

Case 8:23-ap-01148-SC    Doc 48-2    Filed 11/20/24    Entered 11/20/24 14:39:18    Desc
Declaration of Sarah S. Mattingly    Page 19 of 135

<u>Schedule 2.1</u>

**Wiring Instructions**

**Account Holder Name: JGW Solutions LLC**

**Address: 60 Palatine , Apt 215 Irvine, CA 92612**

**Routing Number:** ███████

**Account Number:** ███████

DocuSign Envelope ID: A2D9F4EF-54C6-433C-99DD-25BE863E69E9

Schedule 6.4

**Form of Bill of Sale, Assignment and Assumption Agreement**

This Bill of Sale and Assignment and Assumption Agreement (the "**Bill of Sale**"), effective as of September 22, 2022 (the "**Effective Date**"), is by and between JGW Solutions LLC, a California limited liability company ("**Seller**"), and PurchaseCo80, LLC, a Delaware limited liability company ("**Buyer**").

**WHEREAS**, Seller and Buyer have entered into a certain Asset Purchase Agreement, dated as of September 22, 2022 (the "**Purchase Agreement**"), pursuant to which, among other things, Seller has agreed to assign all of its rights, title and interests in, and Buyer has agreed to assume all of Seller's rights, interest, and title under, the Acquired Assets (as defined in the Purchase Agreement).

**NOW, THEREFORE**, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    <u>Definitions</u>. All capitalized terms used in this Bill of Sale but not otherwise defined herein are given the meanings set forth in the Purchase Agreement.

2.    <u>Assignment and Assumption</u>. Seller hereby sells, assigns, grants, conveys and transfers to Buyer all of Seller's right, title and interest in and to the Acquired Assets. Buyer hereby accepts such assignment and assumes all of Seller's rights, title, and interest, free of any liens under the Acquired Assets accruing on and after the Effective Date.

3.    <u>Terms of the Purchase Agreement</u>. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements and indemnities relating to the Acquired Assets are incorporated herein by this reference. The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

4.    <u>Governing Law</u>. This Bill of Sale shall be governed by and construed in accordance with the internal laws of the State of Texas without giving effect to any choice or conflict of law provision or rule.

5.    <u>Counterparts</u>. This Bill of Sale may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Bill of Sale delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Bill of Sale.

[*Signature page follows.*]

SCHEDULE 6.4
FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

DocuSign Envelope ID: A9D9F4EF-54C6-433S-90DD-25BE863569E9

IN WITNESS WHEREOF, this Bill of Sale has been executed on behalf of each of the Parties as of the Effective Date set forth above.

**SELLER:**

JGW Solutions LLC, a California limited liability company

By: _____

Name:  Jon Jenkins

Title:  CEO

**BUYER:**

PURCHASECO80, LLC, a Delaware limited liability company

By:      Litigation Practice Group, PC, its manager

     By: _____

       Daniel S. March, *Managing Shareholder*

By:      OHP – LPG, LP, member

     By:      Old Hickory Fund I GP, LLC, its general partner

       By: _____

        Adam C. Blum, *Manager*

SCHEDULE 6.4
FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

**EXHIBIT "B"**

1  Marc A. Lieberman, Esq. (Bar No. 157318)
   marc.lieberman@flpllp.com
2  Alan W. Forsley, Esq. (Bar No. 180958)
   alan.forsley@flpllp.com
3  **FLP LAW GROUP LLP**
4  1875 Century Park East, Suite 2230
   Los Angeles, California 90067-2523
5  Telephone:    (310) 284-7350
   Facsimile:    (310) 432-5999
6

7  Attorneys for Defendant JGW Solutions, LLC

8

9              **UNITED STATES BANKRUPTCY COURT**

10          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

11                      **SANTA ANA DIVISION**

12  In re                              )Case No. 8:23-bk-10571-SC
                                       )
13  THE LITIGATION PRACTICE            )Chapter 11
14  GROUP, P.C.,                       )
                            Debtor.)Adv. Proc. No. 8:23-ap-01148-SC
15                                     )
   _____)
16  RICHARD A. MARSHACK, Chapter 11    )
17  Trustee;                           )**DEFENDANT JGW SOLUTIONS, LLC'S**
                                       )**RESPONSES TO PLAINTIFF RICHARD**
18                          Plaintiff,)**A. MARSHACK, CHAPTER 11**
          v.                           )**TRUSTEE'S FIRST SET OF REQUESTS**
19                                     )**FOR ADMISSIONS**
   JGW SOLUTIONS, LLC,                 )
20                                     )
                                       )
21                          Defendant.)
                                       )
22  _____)

23  PROPOUNDING PARTY:        PLANITIFF RICHARD A. MARSHACK, Chapter 11
24                            Trustee

25  RESPONDING PARTY:         DEFENDANT JGW SOLUTIONS, LLC

26  SET:                      ONE

27  _____

28                                     1
           *Defendant's Responses to Plaintiff's First Set of Request for Admissions*

Defendant JGW Solutions, LLC ("**Defendant**") hereby provides these responses, pursuant to <u>Federal Rule of Civil Procedure 36,</u> to the First Set of Requests for Admissions (Set One) (the "**Request**") propounded by Plaintiff Richard A. Marshack, Chapter 11 Trustee.

## I.

## <u>RESPONSE TO REQUESTS FOR ADMISSIONS</u>

<u>**Request for Admission No. 1:**</u>

Admit that DEBTOR paid YOU $197.16 on August 19, 2022.

 <u>**Response to Request for Admission No. 1:**</u>

 Admit.

<u>**Request for Admission No. 2:**</u>

Admit that DEBTOR paid YOU $643.43 on August 26, 2022.

 <u>**Response to Request for Admission No. 2:**</u>

 Admit.

<u>**Request for Admission No. 3:**</u>

Admit that DEBTOR paid YOU $335.24 on September 2, 2022.

 <u>**Response to Request for Admission No. 3:**</u>

 Admit.

<u>**Request for Admission No. 4:**</u>

Admit that DEBTOR paid YOU $457.91 on September 9, 2022.

 <u>**Response to Request for Admission No. 4:**</u>

 Admit.

**Request for Admission No. 5:**

Admit that DEBTOR paid YOU $1,423.06 on September 16, 2022.

**Response to Request for Admission No. 5:**

Admit.

**Request for Admission No. 6:**

Admit that DEBTOR paid YOU $443.38 on September 23, 2022.

**Response to Request for Admission No. 6:**

Admit.

**Request for Admission No. 7:**

Admit that DEBTOR paid YOU $234.98 on September 30, 2022.

**Response to Request for Admission No. 7:**

Admit.

**Request for Admission No. 8:**

Admit that DEBTOR paid YOU $2,351.86 on October 6, 2022.

**Response to Request for Admission No. 8:**

Admit.

**Request for Admission No. 9:**

Admit that DEBTOR paid YOU $3,170.82 on October 14,2022.

**Response to Request for Admission No. 9:**

Admit.

//

//

**Request for Admission No. 10:**

Admit that DEBTOR paid YOU $2,311.99 on October 21, 2022.

    **Response to Request for Admission No. 10:**

    Admit.

**Request for Admission No. 11:**

Admit that DEBTOR paid YOU $1,945.11 on October 28, 2022.

    **Response to Request for Admission No. 11:**

    Admit.

**Request for Admission No. 12:**

Admit that DEBTOR paid YOU $1,833.88 on November 9, 2022.

    **Response to Request for Admission No. 12:**

    Admit.

**Request for Admission No. 13:**

Admit that DEBTOR paid YOU $3,501.86 on November 10, 2022.

    **Response to Request for Admission No. 13:**

    Admit.

**Request for Admission No. 14:**

Admit that DEBTOR paid YOU $118,794.96 on November 15, 2022.

    **Response to Request for Admission No. 14:**

    Admit.

//

//

//

**Request for Admission No. 15:**

Admit that DEBTOR paid YOU $277.97 on November 18, 2022.

      **Response to Request for Admission No. 15:**

      Admit.

**Request for Admission No. 16:**

Admit that DEBTOR paid YOU $4,552.42 on November 18, 2022.

      **Response to Request for Admission No. 16:**

      Admit.

**Request for Admission No. 17:**

Admit that DEBTOR paid YOU $2,465.96 on November 25, 2022.

      **Response to Request for Admission No. 17:**

      Admit.

**Request for Admission No. 18:**

Admit that DEBTOR paid YOU $4,966.66 on December 5, 2022.

      **Response to Request for Admission No. 18:**

      Admit.

**Request for Admission No. 19:**

Admit that DEBTOR paid YOU $41,438.96 on December 5, 2022.

      **Response to Request for Admission No. 19:**

      Admit.

//

//

*Defendant's Responses to Plaintiff's First Set of Request for Admissions*

**Request for Admission No. 20:**

Admit that DEBTOR paid YOU $2,953.62 on December 9, 2022.

**Response to Request for Admission No. 20:**

Admit.

**Request for Admission No. 21:**

Admit that DEBTOR paid YOU $3,843.34 on December 19, 2022.

**Response to Request for Admission No. 21:**

Admit.

**Request for Admission No. 22:**

Admit that DEBTOR paid YOU $3,811.26 on December 27, 2022.

**Response to Request for Admission No. 22:**

Admit.

**Request for Admission No. 23:**

Admit that DEBTOR paid YOU $3,186.14 on December 30, 2022.

**Response to Request for Admission No. 23:**

Admit.

**Request for Admission No. 24:**

Admit that DEBTOR paid YOU $3,792.75 on January 6, 2023.

**Response to Request for Admission No. 24:**

Admit.

//

//

//

*Defendant's Responses to Plaintiff's First Set of Request for Admissions*

**Request for Admission No. 25:**

Admit that DEBTOR paid YOU $3,792.75 on January 10, 2023.

    **Response to Request for Admission No. 25:**

    Admit.

**Request for Admission No. 26:**

Admit that DEBTOR paid YOU $9,459.52 on January 24, 2023.

    **Response to Request for Admission No. 26:**

    Admit.

**Request for Admission No. 27:**

Admit that DEBTOR paid YOU $2,983.32 on January 24, 2023.

    **Response to Request for Admission No. 27:**

    Admit.

**Request for Admission No. 28:**

Admit that DEBTOR paid YOU $211,073.78 on February 1, 2023.

    **Response to Request for Admission No. 28:**

    Admit.

**Request for Admission No. 29:**

Admit that DEBTOR paid YOU $5,626.00 on February 7, 2023.

    **Response to Request for Admission No. 29:**

    Admit.

//

//

*Defendant's Responses to Plaintiff's First Set of Request for Admissions*

**Request for Admission No. 30:**

Admit that Maverick Management Group LLC paid YOU $179,229.82 on March 17, 2023.

**Response to Request for Admission No. 30:**

Admit.

**Request for Admission No. 31:**

Admit that YOU, DEBTOR, and PurchaseCo80, LLC entered into an Asset Purchase Agreement attached as Exhibit A.

**Response to Request for Admission No. 31:**

Admit.

**Request for Admission No. 32:**

Admit that Jon Jenkins executed the Asset Purchase Agreement attached as Exhibit A.

**Response to Request for Admission No. 32:**

Admit.

**Request for Admission No. 33:**

Admit that Jon Jenkins had the authority to execute the Asset Purchase Agreement attached as Exhibit A on YOUR behalf.

**Response to Request for Admission No. 33:**

Admit.

**Request for Admission No. 34:**

Admit that the Asset Purchase Agreement attached as Exhibit A has never been amended.

**Response to Request for Admission No. 34:**

Deny.

//

8

*Defendant's Responses to Plaintiff's First Set of Request for Admissions*

**Request for Admission No. 35:**

Admit that the Asset Purchase Agreement attached as Exhibit A has never been canceled.

**Response to Request for Admission No. 35:**

Deny.

**Request for Admission No. 36:**

Admit that YOU and DEBTOR entered into an Accounts Receivable Purchase Agreement
attached as Exhibit B.

**Response to Request for Admission No. 36:**

Admit.

**Request for Admission No. 37:**

Admit that Jon Jenkins executed the Accounts Receivable Purchase Agreement attached as Exhibit
B.

**Response to Request for Admission No. 37:**

Admit.

**Request for Admission No. 38:**

Admit that Jon Jenkins had the authority to execute the Accounts Receivable Purchase Agreement
attached as Exhibit B on YOUR behalf.

**Response to Request for Admission No. 38:**

Admit.

//

//

//

//

9
*Defendant's Responses to Plaintiff's First Set of Request for Admissions*

**<u>Request for Admission No. 39</u>:**

Admit that the Accounts Receivable Purchase Agreement attached as Exhibit B has never been amended.

**<u>Response to Request for Admission No. 39</u>:**

Deny.

**<u>Request for Admission No. 40</u>:**

Admit that the Accounts Receivable Purchase Agreement attached as Exhibit B has never been canceled.

**<u>Response to Request for Admission No. 40</u>:**

Deny.

**<u>Request for Admission No. 41</u>:**

Admit that YOU and DEBTOR entered into an Accounts Receivable Purchase Agreement attached as Exhibit C.

**<u>Response to Request for Admission No. 41</u>:**

Admit.

**<u>Request for Admission No. 42</u>:**

Admit that Jon Jenkins executed the Accounts Receivable Purchase Agreement attached as Exhibit C.

**<u>Response to Request for Admission No. 42</u>:**

Admit.

//

//

//

*Defendant's Responses to Plaintiff's First Set of Request for Admissions*

**<u>Request for Admission No. 43</u>:**

Admit that Jon Jenkins had the authority to execute the Accounts Receivable Purchase Agreement attached as Exhibit Con YOUR behalf.

      **<u>Response to Request for Admission No. 43</u>:**

      Admit.

**<u>Request for Admission No. 44</u>:**

Admit that the Accounts Receivable Purchase Agreement attached as Exhibit C has never been amended.

      **<u>Response to Request for Admission No. 44</u>:**

      Deny.

**<u>Request for Admission No. 45</u>:**

Admit that the Accounts Receivable Purchase Agreement attached as Exhibit C has never been canceled.

      **<u>Response to Request for Admission No. 45</u>:**

      Deny.

**<u>Request for Admission No. 46</u>:**

Admit that YOU and DEBTOR entered into an Accounts Receivable Purchase Agreement attached as Exhibit D.

      **<u>Response to Request for Admission No. 46</u>:**

      Admit.

//

//

//

11
*Defendant's Responses to Plaintiff's First Set of Request for Admissions*

**Request for Admission No. 47:**

Admit that Jon Jenkins executed the Accounts Receivable Purchase Agreement attached as Exhibit D.

**Response to Request for Admission No. 47:**

Admit.

**Request for Admission No. 48:**

Admit that Jon Jenkins had the authority to execute the Accounts Receivable Purchase Agreement attached as Exhibit D on YOUR behalf.

**Response to Request for Admission No. 48:**

Admit.

**Request for Admission No. 49:**

Admit that the Accounts Receivable Purchase Agreement attached as Exhibit D has never been amended.

**Response to Request for Admission No. 49:**

Deny.

**Request for Admission No. 50:**

Admit that the Accounts Receivable Purchase Agreement attached as Exhibit D has never been canceled.

**Response to Request for Admission No. 50:**

Deny.

//

//

//

**Request for Admission No. 51:**

Admit that YOU and DEBTOR entered into an Accounts Receivable Purchase Agreement

attached as Exhibit E.

      **Response to Request for Admission No. 51:**

      Admit.

**Request for Admission No. 52:**

Admit that Jon Jenkins executed the Accounts Receivable Purchase Agreement attached as Exhibit

E.

      **Response to Request for Admission No. 52:**

      Admit.

**Request for Admission No. 53:**

Admit that Jon Jenkins had the authority to execute the Accounts Receivable Purchase Agreement

attached as Exhibit E on YOUR behalf.

      **Response to Request for Admission No. 53:**

      Admit.

**Request for Admission No. 54:**

Admit that the Accounts Receivable Purchase Agreement attached as Exhibit E has never been

amended.

      **Response to Request for Admission No. 54:**

      Deny.

//

//

//

*Defendant's Responses to Plaintiff's First Set of Request for Admissions*

**Request for Admission No. 55:**

Admit that the Accounts Receivable Purchase Agreement attached as Exhibit E has never been canceled.

**Response to Request for Admission No. 55:**

Deny.

**Request for Admission No. 56:**

Admit that YOU and DEBTOR entered into an Accounts Receivable Purchase Agreement attached as Exhibit F.

**Response to Request for Admission No. 56:**

Admit.

**Request for Admission No. 57:**

Admit that Jon Jenkins executed the Accounts Receivable Purchase Agreement attached as Exhibit F.

**Response to Request for Admission No. 57:**

Admit.

**Request for Admission No. 58:**

Admit that Jon Jenkins had the authority to execute the Accounts Receivable Purchase Agreement attached as Exhibit F on YOUR behalf.

**Response to Request for Admission No. 58:**

Admit.

//

//

//

---

14

*Defendant's Responses to Plaintiff's First Set of Request for Admissions*

**Request for Admission No. 59:**

Admit that the Accounts Receivable Purchase Agreement attached as Exhibit F has never been amended.

**Response to Request for Admission No. 59:**

Deny.

**Request for Admission No. 60:**

Admit that the Accounts Receivable Purchase Agreement attached as Exhibit F has never been canceled.

**Response to Request for Admission No. 60:**

Deny.

**Request for Admission No. 61:**

Admit that YOU did not register with the State Bar of California as a LAWYER REFERRAL SERVICE.

**Response to Request for Admission No. 61:**

Admit.

**Request for Admission No. 62:**

Admit that YOU had access to LUNA.

**Response to Request for Admission No. 62:**

Deny.

**[The remainder of this page is intentionally left blank].**

15
*Defendant's Responses to Plaintiff's First Set of Request for Admissions*

1

2    **Request for Admission No. 63:**

3    Admit that YOU used LUNA.

4        **Response to Request for Admission No. 63:**

5        Deny.

6

7    DATED:  May ___, 2024                    **FLP LAW GROUP LLP**

8
                                        By: _____
9                                            Marc A. Lieberman, Esq.
                                            Alan W. Forsley, Esq.
10                                           Attorneys for Defendant JGW Solutions LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                      16
        *Defendant's Responses to Plaintiff's First Set of Request for Admissions*

1

2
## VERIFICATION

3   UNITED STATES BANKRUPTCY COURT   )

4                                    )

5   CENTRAL DISTRICT OF CALIFORNIA   )

6

7

8       I, JGW SOLUTIONS, LLC, declare as follows:

9       I am a defendant in the above-entitled action. I have read the foregoing

10  **DEFENDANT JGW SOLUTIONS, LLC'S RESPONSES TO PLAINTIFF**

11  **RICHARD A. MARSHACK, CHAPTER 11 TRUSTEE'S FIRST SET OF**

12  **REQUESTS FOR ADMISSIONS** and know the contents thereof. The matters stated in

13  the foregoing document are true of my own knowledge except as to those matters which

    are stated on information and belief, and as to those matters, I believe them to be true.
14
        I declare under penalty of perjury under the laws of the United States and the State
15
    of California that the foregoing is true and correct.
16
        Executed this 21ˢᵗ day of May 2024 in Irvine, California.
17

18
                                              JGW SOLUTIONS, LLC
19

20

21                                            Jon Jenkins, CEO

22

23

24

25

26

27

28
                                              17
        *Defendant's Responses to Plaintiff's First Set of Request for Admissions*

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

FLP LAW GROUP LLP 1875 Century Park East, Suite 2230, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*): **DEFENDANT JGW SOLUTIONS, LLC'S RESPONSES TO PLAINTIFF RICHARD A. MARSHACK, CHAPTER 11 TRUSTEE'S FIRST SET OF REQUESTS FOR ADMISSIONS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

I.  ~~**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:~~

~~☐  Service information continued on attached page~~

II.  ~~**SERVED BY UNITED STATES MAIL**:~~
~~On (*date*), I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.~~

~~☐  Service information continued on attached page~~

III.  **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **May 22, 2024**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or **email** as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**VIA EMAIL:**
Paige E. Hornback: Paige.Hornback@Dinsmore.com
Jaime Herald: Jamie.Herald@DINSMORE.COM
Sarah Mattingly: Sarah.Mattingly@DINSMORE.COM
Yosina Lissebeck: Yosina.Lissebeck@Dinsmore.com

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 22, 2024 | SAFA SALEEM | *[signature]* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

**EXHIBIT "C"**

DocuSign Envelope ID: 1855A9A4-54E9-4523-9158-5BA82FB604BA

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of November 7, 2022 (the "**Agreement Date**"), by and between The Litigation Practice Group PC (collectively the "**Buyer**"), and JGW Solutions, LLC (the "**Seller" or "LPG"**, and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    <u>Certain Definitions</u>.  Certain defined terms used in this Agreement are set forth on **<u>Exhibit A</u>**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    <u>Assignment of the Purchased Accounts to the Buyer</u>.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    <u>No Assumption of Liabilities</u>.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    <u>Payment of Purchase Price</u>.  Buyer shall pay $118,794.96 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **<u>Schedule 2.3</u>** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    <u>Guarantee of LPG</u>.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

DocuSign Envelope ID: 4855A9A4-54E9-4523-9158-5BA82FB694BA

package as a whole equals 80%. This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing. The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Power and Authority. The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts. The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents. The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

DocuSign Envelope ID: 1855A9A4-54E9-4523-9458-5BA82FB694BA

Section 3.6     Compliance with Laws.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7     Legal Proceedings.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8     Condition of Purchased Accounts.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9     Confidentiality.  Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

# ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1     Organization; Good Standing.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2     Power and Authority.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

DocuSign Envelope ID: d8E5A9A4-54E9-4523-9458-5BA82FB604BA

Section 4.3    No Conflicts. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    Sufficient Funds. The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    Appropriate Actions.

(a)    General. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    Closing. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing. The date on which the Closing occurs is hereinafter referred to as the "**Closing Date.**" The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    Closing Deliverables of the Seller. At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    Closing Deliverables of the Buyer. At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    Indemnification by the Seller. Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    <u>Indemnification by the Buyer</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    <u>Indemnification Procedures</u>.

(a)    <u>No Restraints</u>.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, <u>provided</u>, <u>however</u>, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; <u>provided</u>, <u>however</u>, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

DocuSign Envelope ID: 1B55A9A4-54E9-4523-9458-5BA82FB6948A

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)     If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1     Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2     Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3     Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission.  A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: 4855A9A4-54E9-4523-9458-5DA82FB694BA

Section 7.4    <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    <u>Public Disclosure</u>.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    <u>Expenses and Fees</u>.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    <u>Governing Law</u>.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

DocuSign Envelope ID: 4855A9A4-54E9-4523-9158-5BA82FB694BA

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**The Litigation Practice Group P.C.**

By: _Daniel S March_____
       9D494DB1993341E...
       Name: Daniel S March
       Title: Managing Shareholder

**SELLER:**

**JGW Solutions LLC**

By: _Jon Jenkins_____
       DCC4A03DD2DC418...
       Name: Jon Jenkins
       Title: CEO

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _Daniel S March_____
       9D494DB1993341E...
       Name: Daniel S. March
       Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

DocuSign Envelope ID: 185E5A9A4-54E9-4523-9158-5BA82FB694BA

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

DocuSign Envelope ID: 1855A9A4-54E9-4523-9158-5BA82FB694BA

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: 1855A9A4-54E9-4523-9458-5BA82FB694BA

(bb)     "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)     "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)     "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)     "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)     "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)     "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)     "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)     "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)     "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)     "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)     "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

DocuSign Envelope ID: 385F5A9A4-54E9-4523-9468-5BA82FB604BA

**EXHIBIT B**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**. Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      <u>Defined Terms</u>. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.      <u>Sale of Purchased Accounts; Assignment</u>. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.      <u>Further Assurances</u>. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.      <u>Terms of the Purchase Agreement</u>. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.      <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

DocuSign Envelope ID: 185EA9A4-54E9-4E23-9458-5BA82FB694BA

Case 8:23-ap-01148-SC   Doc 48-2   Filed 11/20/24   Entered 11/20/24 14:39:18   Desc
Declaration of Sarah S. Mattingly   Page 54 of 135

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER: The Litigation Practice Group P.C.**

By: _____
    *Daniel S March*
    Name: Daniel S. March
    Title: Managing Shareholder

**SELLER:**

**JGW Solutions LLC**

By: _____
    *Jon Jenkins*
    Name: Jon Jenkins
    Title: CEO

DocuSign Envelope ID: 4B5EA9A4-54E9-4523-9458-5BA82FB604BA

**Schedule 2.3**
**Wire Instructions**

<u>**$118,794.96**</u>

**Account Holder Name: JGW Solutions LLC**

**Address: 60 Palatine , Apt 215 Irvine, CA 92612**

**Routing Number:** ███████

**Account Number:** ███████

**EXHIBIT "D"**

DocuSign Envelope ID: 335D99AA-2B08-48FE-B298-D5BA7526A80C

### ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of November 17, 2022 (the "**Agreement Date**"), by and between The Litigation Practice Group PC (collectively the "**Buyer**"), and JGW Solutions, LLC (the "**Seller" or "LPG**", and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $41,438.96 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

package as a whole equals 80%. This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    <u>Organization; Good Standing</u>.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    <u>Power and Authority</u>.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller, and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    <u>Title to, and Sufficiency of, the Purchased Accounts</u>.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    <u>Consents</u>.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    <u>No Conflicts</u>. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

DocuSign Envelope ID: 335D99AA-2BD8-48FE-B298-D5BA7526A80C

Section 3.6    <u>Compliance with Laws</u>.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    <u>Legal Proceedings</u>.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    <u>Condition of Purchased Accounts</u>.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    <u>Confidentiality</u>. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

**ARTICLE 4.**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3        No Conflicts.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4        Sufficient Funds.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

# ARTICLE 5.
# COVENANTS

Section 5.1        Appropriate Actions.

(a)        General.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

# ARTICLE 6.
# CLOSING

Section 6.1        Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2        Closing Deliverables of the Seller.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3        Closing Deliverables of the Buyer.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4        Indemnification by the Seller.  Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    <u>Indemnification by the Buyer</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    <u>Indemnification Procedures</u>.

(a)    <u>No Restraints</u>.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, <u>provided</u>, <u>however</u>, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; <u>provided</u>, <u>however</u>, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission.  A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: 335D99AA-2B08-48FE-B298-D5BA7526A80C

Section 7.4    Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    Public Disclosure.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    Expenses and Fees.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

DocuSign Envelope ID: c35D3790AA-2B08-48FE-B898-D5BA7526A80C

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**The Litigation Practice Group P.C.**

By: _____
Name: Daniel S March
Title: Managing Shareholder

**SELLER:**

**JGW Solutions LLC**

By: _____
Name: Jon Jenkins
Title: CEO

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _____
Name: Daniel S. March
Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

DocuSign Envelope ID: 335D99AA-2B08-48EE-B298-D5BA7526A80C

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

DocuSign Envelope ID: 335D99AA-2B08-48EE-B298-D5BA7526A80C

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on-or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: 335D99AA-2B08-48FE-B298-D5BA7526A80C

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

DocuSign Envelope ID: 335D99AA-2B08-48FE-B298-D5BA7526A80C

**EXHIBIT B**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**.  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      Defined Terms.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.      Sale of Purchased Accounts; Assignment.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.      Further Assurances.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.      Terms of the Purchase Agreement.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.   The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.      Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

DocuSign Envelope ID: 335D99AA-2B08-48FE-B298-D5BA752CA80C

Case 8:23-ap-01148-SC    Doc 48-2    Filed 11/20/24    Entered 11/20/24 14:39:18    Desc
Declaration of Sarah S. Mattingly    Page 69 of 135

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER: The Litigation Practice Group P.C.**

By: _Daniel S March_____
    9D494DB199334 1E
    Name: Daniel S. March
    Title: Managing Shareholder

**SELLER:**

**JGW Solutions LLC**

By: _Jon Jenkins_____
    DCC4A03DD2DC418...
    Name: Jon Jenkins
    Title: CEO

**Schedule 2.3**
**Wire Instructions**

<u>**$41,438.96**</u>

**Account Holder Name: JGW Solutions LLC**

**Address: 60 Palatine , Apt 215 Irvine, CA 92612**

**Routing Number:** ████████

**Account Number:** ████████

**EXHIBIT "E"**

DocuSign Envelope ID: 76A5F5CC-D924C67-8EA1-B5D8A99J5F5F0

**ACCOUNTS RECEIVABLE PURCHASE AGREEMENT**

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of January 23, 2023 (the "**Agreement Date**"), by and between The Litigation Practice Group PC (collectively the "**Buyer**"), and JGW Solutions, LLC (the "**Seller" or "LPG"**, and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

**RECITALS**

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

**ARTICLE 1.**
**DEFINITIONS**

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

**ARTICLE 2.**
**ASSIGNMENT AND TRANSFER AND CONSIDERATION**

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $211,073.78 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

DocuSign Envelope ID: 76A9F5CC-1DD2-4C67-8EA1-85D8A991F5F0

package as a whole equals 80%.  This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

DocuSign Envelope ID: 76A9E5CC-4DD2-4C67-8EA1-85D8A981F5F0

Section 3.6    <u>Compliance with Laws</u>.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    <u>Legal Proceedings</u>.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    <u>Condition of Purchased Accounts</u>.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    <u>Confidentiality</u>. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3        No Conflicts.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4        Sufficient Funds.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1        Appropriate Actions.

(a)        General.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1        Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2        Closing Deliverables of the Seller.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3        Closing Deliverables of the Buyer.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4        Indemnification by the Seller.  Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurrence related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    Indemnification Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

DocuSign Envelope ID: 76A5F5CC-1DD2-4C67-8EA1-85D8A981F5F0

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: 76A9F5CC-1DD2-4C67-8EA1-85D8A991F5F0

Section 7.4     Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5     Public Disclosure.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6     Expenses and Fees.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7     Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8     Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9     Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

DocuSign Envelope ID: 76A5F5CC-1DD2-4C67-8EA1-85D8A881F5F0

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**The Litigation Practice Group P.C.**

By: _____
      Name: Daniel S March
      Title: Managing Shareholder

**SELLER:**

**JGW Solutions LLC**

By: _____
      Name: Jon Jenkins
      Title: CEO

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _____
      Name: Daniel S. March
      Title: Managing Shareholder

DocuSign Envelope ID: 76A5E5CC-ADD2-4C63-8EA1-85D8A981F5F0

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: 76A5F5CC-1DD2-4C63-8EA1-85D8A99LF5F0

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

DocuSign Envelope ID: 76A5F5CC-4DD2-4C67-8EA1-85D8A9E1F5F0

## EXHIBIT B

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**. Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. <u>Defined Terms</u>. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2. <u>Sale of Purchased Accounts; Assignment</u>. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3. <u>Further Assurances</u>. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4. <u>Terms of the Purchase Agreement</u>. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

DocuSign Envelope ID: 764CF5CC-4DD2-4C67-8EA1-85D8A99AF5F0

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER: The Litigation Practice Group P.C.**

By: _Daniel S March_
     9D494DB1993341E

Name: Daniel S. March
Title: Managing Shareholder

**SELLER:**

**JGW Solutions LLC**

By: _Jon Jenkins_
     DCC4A03DD2DC418...

Name: Jon Jenkins
Title: CEO

DocuSign Envelope ID: 76A9F5CC-4DD2-4C67-8EA1-85D8A991F5F0

Case 8:23-ap-01148-SC   Doc 48-2   Filed 11/20/24   Entered 11/20/24 14:39:18   Desc
Declaration of Sarah S. Mattingly   Page 85 of 135

**Schedule 2.3**
**Wire Instructions**

<u>**$211,073.78**</u>

**Account Holder Name: JGW Solutions LLC**

**Address: 60 Palatine , Apt 215 Irvine, CA 92612**

**Routing Number:** ████████

**Account Number:** ████████

**EXHIBIT "F"**

DocuSign Envelope ID: 3F18490D-AB61-4B08-8B30-FB0D195A16B5

**ACCOUNTS RECEIVABLE PURCHASE AGREEMENT**

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of January 28, 2023 (the "**Agreement Date**"), by and between The Litigation Practice Group PC (collectively the "**Buyer**"), and JGW Solutions, LLC (the "**Seller" or "LPG"**, and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

**RECITALS**

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

**ARTICLE 1.
DEFINITIONS**

Section 1.1    <u>Certain Definitions</u>.  Certain defined terms used in this Agreement are set forth on **<u>Exhibit A</u>**.

**ARTICLE 2.
ASSIGNMENT AND TRANSFER AND CONSIDERATION**

Section 2.1    <u>Assignment of the Purchased Accounts to the Buyer</u>.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    <u>No Assumption of Liabilities</u>.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    <u>Payment of Purchase Price</u>.  Buyer shall pay $179,229.82 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **<u>Schedule 2.3</u>** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    <u>Guarantee of LPG</u>.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

DocuSign Envelope ID: 3F18490D-AB61-4308-8B30-FB0D195A1685

package as a whole equals 80%.  This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1        Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2        Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3        Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4        Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5        No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6    <u>Compliance with Laws</u>.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    <u>Legal Proceedings</u>.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    <u>Condition of Purchased Accounts</u>.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    <u>Confidentiality</u>.  Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

**ARTICLE 4.**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

DocuSign Envelope ID: 3F18490D-AB61-4B08-8B30-FB0D195A1685

Section 4.3     <u>No Conflicts</u>. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4     <u>Sufficient Funds</u>. The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1     <u>Appropriate Actions</u>.

(a)     <u>General</u>. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1     <u>Closing</u>. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing. The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2     <u>Closing Deliverables of the Seller</u>. At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3     <u>Closing Deliverables of the Buyer</u>. At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4     <u>Indemnification by the Seller</u>. Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

DocuSign Envelope ID: 3F18490D-AB61-4B08-8B30-FB0D195A1685

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurrence related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    Indemnification Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

DocuSign Envelope ID: 3F18490D-AB51-4208-8B30-FB0D195A1685

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

### ARTICLE 7.
### MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission.  A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: 3F18490D-AB51-4B08-8B30-FB0D195A16B5

Case 8:23-ap-01148-SC   Doc 48-2   Filed 11/20/24   Entered 11/20/24 14:39:18   Desc
Declaration of Sarah S. Mattingly   Page 93 of 135

Section 7.4     <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5     <u>Public Disclosure</u>.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6     <u>Expenses and Fees</u>.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7     <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8     <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9     <u>Governing Law</u>.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10     <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11     <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

DocuSign Envelope ID: 3F18490D-AB61-4B08-8B30-FB0D195A16B5

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**The Litigation Practice Group P.C.**

By: _Daniel S March_ _____
DocuSigned by:
9D494DB1993341E...
Name: Daniel S March
Title: Managing Shareholder

**SELLER:**

**JGW Solutions LLC**

By: _Jon Jenkins_ _____
DocuSigned by:
DCC4A03DD2DC418...
Name: Jon Jenkins
Title: CEO

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _Daniel S March_ _____
DocuSigned by:
9D494DB1993341E...
Name: Daniel S. March
Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

DocuSign Envelope ID: 3F18490D-AB61-4B08-8B30-FB0D195A1685

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)     "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)     "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)     "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)     "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)     "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)     "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)     "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)     "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)      "**Closing**" shall have the meaning set forth in Section 6.1.

(j)      "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)      "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)      "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)     "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)      "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

DocuSign Envelope ID: 3F18490D-AB61-4B08-8B30-FB0D195A1685

(o)        "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)        "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)        "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)        "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)        "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)        "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)        "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)        "**Losses**" shall have the meaning set forth in Section 6.4.

(w)        "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)        "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)        "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)        "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)        "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: 3F18490D-AB61-4B08-8B30-FB0D195A1685

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

DocuSign Envelope ID: 3F18490D-AB61-4B08-8B30-FB0D195A1685

## EXHIBIT B

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**.  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.     Defined Terms.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.     Sale of Purchased Accounts; Assignment.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.     Further Assurances.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.     Terms of the Purchase Agreement.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.   The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.     Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

DocuSign Envelope ID: 3F18490D-AB61-4B08-8B30-FB0D195A16B5

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER: The Litigation Practice Group P.C.**

By: _Daniel S. March_
9D494DB1993341E...
    Name: Daniel S. March
    Title: Managing Shareholder

**SELLER:**

**JGW Solutions LLC**

By: _Jon Jenkins_
DCC4A03DD2DC418...
    Name: Jon Jenkins
    Title: CEO

DocuSign Envelope ID: 3F18490D-AB61-4B08-8B30-FB0D195A1685

Case 8:23-ap-01148-SC    Doc 48-2    Filed 11/20/24    Entered 11/20/24 14:39:18    Desc
Declaration of Sarah S. Mattingly    Page 100 of 135

**Schedule 2.3**
**Wire Instructions**

**$179,229.82**

**Account Holder Name: JGW Solutions LLC**

**Address: 60 Palatine , Apt 215 Irvine, CA 92612**

**Routing Number:** ███████

**Account Number:** ███████

**EXHIBIT "G"**

DocuSign Envelope ID: 7B3836FD-FB88-4F50-A6A6-B3151BE7D805

**ACCOUNTS RECEIVABLE PURCHASE AGREEMENT**

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of March 31st, 2023 (the "**Agreement Date**"), by and between The Litigation Practice Group PC (collectively the "**Buyer**"), and JGW Solutions, LLC (the "**Seller" or "LPG"**, and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

**RECITALS**

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

**ARTICLE 1.
DEFINITIONS**

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

**ARTICLE 2.
ASSIGNMENT AND TRANSFER AND CONSIDERATION**

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $248,754.80 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

DocuSign Envelope ID: 7B3836FD-FB88-4F50-A6A6-B3151BE7D805

package as a whole equals 80%.  This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1      Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2      Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3      Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4      Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5      No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

DocuSign Envelope ID: 7B3836FD-FB88-4F50-A6A6-B3151BE7D805

Section 3.6    <u>Compliance with Laws</u>.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    <u>Legal Proceedings</u>.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    <u>Condition of Purchased Accounts</u>.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    <u>Confidentiality</u>. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    No Conflicts.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    Sufficient Funds.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    Appropriate Actions.

(a)    General.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    Closing Deliverables of the Seller.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    Closing Deliverables of the Buyer.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    Indemnification by the Seller.  Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

DocuSign Envelope ID: 7B3836FD-FB88-4F50-A6A6-B3151BE7D805

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurrence related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    Indemnification Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

DocuSign Envelope ID: 7B38836FD-FB88-4F50-A5A6-B3151BE7D805

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)     If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1     Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2     Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3     Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: 7B9836FD-FB88-4F50-A6A6-B3151BE7D805

Section 7.4    Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    Public Disclosure.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    Expenses and Fees.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**The Litigation Practice Group P.C.**

By: _Daniel S March_____
Name: Daniel S March
Title: Managing Shareholder


**SELLER:**

**JGW Solutions LLC**

By: _Jon Jenkins_____
Name: Jon Jenkins
Title: CEO


**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _Daniel S March_____
Name: Daniel S. March
Title: Managing Shareholder


*[Signature Page to Accounts Receivable Purchase Agreement]*

DocuSign Envelope ID: 7B3836FD-FB88-4F50-A6A6-B3151BE7D805

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

DocuSign Envelope ID: 7B3836FD-FB88-4F50-A6A6-B3151BE7D805

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: 7B3836FD-FB88-4F50-A6A6-B3151BE7D805

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

DocuSign Envelope ID: 7B3836FD-FB88-4F50-A6A6-B3151B57D805

## EXHIBIT B

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**.  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.    <u>Sale of Purchased Accounts; Assignment</u>.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.    <u>Further Assurances</u>.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.    <u>Terms of the Purchase Agreement</u>.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.   The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

DocuSign Envelope ID: 7B3836FD-FB88-4F50-A5A6-B3151BE7D805

Case 8:23-ap-01148-SC    Doc 48-2    Filed 11/20/24    Entered 11/20/24 14:39:18    Desc
Declaration of Sarah S. Mattingly    Page 114 of 135

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER: The Litigation Practice Group P.C.**

By: _Daniel S March_
9D494DB1993341E...
Name: Daniel S. March
Title: Managing Shareholder

**SELLER:**

**JGW Solutions LLC**

By: _Jon Jenkins_
DCC4A03DD2DC418...
Name: Jon Jenkins
Title: CEO

DocuSign Envelope ID: 7B3836FD-FB88-4F50-A6A6-B3151BE7D805

**Schedule 2.3**
**Wire Instructions**

<u>**$248,754.80**</u>

**Account Holder Name: JGW Solutions LLC**

**Address: 60 Palatine , Apt 215 Irvine, CA 92612**

**Routing Number:** ██████

**Account Number:** ██████

**EXHIBIT "H"**

Christopher B. Ghio (State Bar No. 259094)
Christopher Celentino (State Bar No. 131688)
Yosina M. Lissebeck (State Bar No. 201654)
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Telephone: 619.400.0500
Facsimile: 619.400.0501
christopher.ghio@dinsmore.com
christopher.celentino@dinsmore.com
yosina.lissebeck@dinsmore.com

Sarah S. Mattingly (Ky. Bar 94257 – Admitted pro hac vice)
**DINSMORE & SHOHL LLP**
101 S. Fifth Street, Suite 2500
Louisville, KY 40202
Telephone: 859-425-1096
Facsimile: 502-585-2207
Sarah.mattingly@dinsmore.com

*Special Counsel to Richard A. Marshack,*
*Chapter 11 Trustee*

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE LITIGATION PRACTICE GROUP P.C.,<br><br>   Debtor. | Case No. 8:23-bk-10571-SC<br><br>Chapter 11<br><br>Adv. Proc. No. 8:23-cp-01148-SC |
| RICHARD A. MARSHACK,<br>Chapter 11 Trustee,<br>      Plaintiff,<br><br>   v.<br><br>JGW SOLUTIONS LLC,<br><br>      Defendant. | **PLAINTIFF RICHARD A. MARSHACK, CHAPTER 11 TRUSTEE'S RESPONSES TO DEFENDANT JGW SOLUTIONS LLC'S FIRST SET OF REQUESTS FOR ADMISSIONS** |

**PROPOUNDING PARTY:**  **JGW SOLUTIONS LLC**

**RESPONDING PARTY:**   **RICHARD A. MARSHACK**

**SET NUMBER:**     **ONE**

## **REQUESTS FOR ADMISSION**

### **REQUEST FOR ADMISSION NO. 1:**

Admit that defendant JGW Solutions, Inc. ("**DEFENDANT**") did not enter into any illegal agreements with debtor The Litigation Practice Group, Inc. ("**DEBTOR**").

**RESPONSE: Deny.**

### **REQUEST FOR ADMISSION NO. 2:**

Admit that when DEBTOR and DEFENDANT entered into the Account Receivable Purchase Agreements, attached as Exhibits 2 to 6 to the complaint ("**AGREEMENTS**") filed in this matter adversary Case No. 8:23-ap-01148-SC ("**COMPLAINT**"), that DEBTOR knew the AGREEMENTS violated the California Rules of Professional Conduct ("**RULES**").

**RESPONSE: Upon reasonable inquiry, the information that the Trustee knows or can readily obtain is insufficient to enable it to admit or deny this Request. The Trustee is not the Debtor, and thus does not have information sufficient to admit or deny this Request.**

### **REQUEST FOR ADMISSION NO. 3:**

Admit that the RULES prohibited DEBTOR from entering into the AGREEMENTS with DEFENDANT.

**RESPONSE: Admit.**

### **REQUEST FOR ADMISSION NO. 4:**

Admit that the RULES did not prohibit DEFENDANT from entering into the AGREEMENTS with DEBTOR.

**RESPONSE: Admit. The California Rules of Professional Conduct regulate the professional conduct of lawyers.**

**REQUEST FOR ADMISSION NO. 5:**

Admit that DEBTOR violated the California Business and Professions Code by entering into the AGREEMENTS with DEFENDANT.

**RESPONSE: Admit.**

**REQUEST FOR ADMISSION NO. 6:**

Admit that DEBTOR knew when it entered into the AGREEMENTS with DEFENDANT that the AGREEMENTS violated the California Business and Professions Code.

**RESPONSE: Upon reasonable inquiry, the information that the Trustee knows or can readily obtain is insufficient to enable it to admit or deny this Request. The Trustee is not the Debtor, and thus does not have information sufficient to admit or deny this Request.**

**REQUEST FOR ADMISSION NO. 7:**

Admit that March 17, 2023 transfer of $179,229.82 to DEFENDANT as alleged in the COMPLAINT came from Maverick Management Group, LLC and not DEBTOR.

**RESPONSE: Deny.**

**REQUEST FOR ADMISSION NO. 8:**

Admit that none of the $621,090.91 in transfers from DEBTOR to DEFENDANTS as alleged in the COMPLAINT came from DEBTOR's client trust account.

**RESPONSE: Upon reasonable inquiry, the information that the Trustee knows or can readily obtain is insufficient to enable it to admit or deny this Request.**

Dated: May 10, 2024

DINSMORE & SHOHL LLP

By: /s/ Sarah S. Mattingly
   Christopher B. Ghio
   Christopher Celentino
   Yosina M. Lissebeck
   Sarah S. Mattingly (pro hac vice)
   *Special Counsel to Richard A.*
   *Marshack, Chapter 11 Trustee*

**EXHIBIT "I"**

Christopher B. Ghio (State Bar No. 259094)
Christopher Celentino (State Bar No. 131688)
Yosina M. Lissebeck (State Bar No. 201654)
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Telephone: 619.400.0500
Facsimile: 619.400.0501
christopher.ghio@dinsmore.com
christopher.celentino@dinsmore.com
yosina.lissebeck@dinsmore.com

Sarah S. Mattingly (Ky. Bar 94257 – Admitted pro hac vice)
**DINSMORE & SHOHL LLP**
101 S. Fifth Street, Suite 2500
Louisville, KY 40202
Telephone: 859-425-1096
Facsimile: 502-585-2207
Sarah.mattingly@dinsmore.com

*Special Counsel to Richard A. Marshack,*
*Chapter 11 Trustee*

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE LITIGATION PRACTICE GROUP P.C.,<br><br>        Debtor. | Case No. 8:23-bk-10571-SC<br><br>Chapter 11<br><br>Adv. Proc. No. 8:23-cp-01148-SC |
| RICHARD A. MARSHACK,<br>Chapter 11 Trustee,<br>                Plaintiff,<br><br>        v.<br><br>JGW SOLUTIONS LLC,<br><br>                Defendant. | **PLAINTIFF RICHARD A. MARSHACK, CHAPTER 11 TRUSTEE'S RESPONSES TO DEFENDANT JGW SOLUTIONS LLC'S FIRST SET OF SPECIAL INTERROGATORIES** |

**PROPOUNDING PARTY:**     **JGW SOLUTIONS LLC**

**RESPONDING PARTY:**      **RICHARD A. MARSHACK**

**SET NUMBER:**           **ONE**

I.

1

1
2

## SPECIALLY PREPARED INTERROGATORIES

3

## SPECIAL INTERROGATORY NO. 1:

4
5
6

If plaintiff Richard Marshack, Chapter 11 Trustee's ("**TRUSTEE**") response to request for admission number 1 served with these interrogatories is not an unqualified admission, state all facts upon which the TRUSTEE bases his denial.

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**RESPONSE: Trustee denies that Defendant did not enter into any illegal agreements with Debtor. The Accounts Receivable Purchase Agreements that Defendant and Debtor entered into on November 7, 2022; November 17, 2022; January 23, 2023; February 28, 20923; and March 31, 2023 were made pursuant to an Affiliate Agreement between the Debtor and Defendant, in which Defendant generated leads consisting of consumers interested in the legal services offered by LPG and referred those consumers to Debtor in exchange for payment. The Affiliate Agreement violates Sections 6151 and 6155 of the California Business and Professional Code, which prohibit referrals of potential clients to attorneys unless registered with the State Bar of California. Each Accounts Receivable Purchase Agreement, by its terms, state that Debtor was to sell Defendant streams of monthly payments from consumers representing unearned legal fees that were supposed to be held in trust until earned or used for the benefit of consumers. Thus, the effect of these agreements is to accomplish an unlawful purpose, making each agreement illegal under California law. *See Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 1121 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)).**

25

## SPECIAL INTERROGATORY NO. 2:

26
27
28

If the TRUSTEE's response to request for admission number 2 served with these interrogatories is not an unqualified admission, state all facts upon which the TRUSTEE bases his denial.

2

**RESPONSE:** Trustee did not deny Request for Admission No. 2. Trustee is not the Debtor, and thus does not have information sufficient to admit or deny the Request.

**SPECIAL INTERROGATORY NO. 3:**

If the TRUSTEE's response to request for admission number 3 served with these interrogatories is not an unqualified admission, state all facts upon which the TRUSTEE bases his denial.

**RESPONSE: N/A. See admission in response to Request for Admission No. 3.**

**SPECIAL INTERROGATORY NO. 4:**

If the TRUSTEE's response to request for admission number 4 served with these interrogatories is not an unqualified admission, state all facts upon which the TRUSTEE bases his denial.

**RESPONSE: N/A. See admission and explanation in response to Request for Admission No. 4.**

**SPECIAL INTERROGATORY NO. 5:**

If the TRUSTEE's response to request for admission number 5 served with these interrogatories is not an unqualified admission, state all facts upon which the TRUSTEE bases his denial.

**RESPONSE: N/A. See admission in response to Request for Admission No. 5.**

**SPECIAL INTERROGATORY NO. 6:**

If the TRUSTEE's response to request for admission number 6 served with these interrogatories is not an unqualified admission, state all facts upon which the TRUSTEE bases his denial.

3

**RESPONSE:** Trustee did not deny Request for Admission No. 6. Trustee is not the Debtor, and thus does not have information sufficient to admit or deny the Request.

**SPECIAL INTERROGATORY NO. 7:**

If the TRUSTEE's response to request for admission number 7 served with these interrogatories is not an unqualified admission, state all facts upon which the TRUSTEE bases his denial.

**RESPONSE:** Trustee denies the $621,090.91 in transfers from Debtor to Defendant as alleged in the Complaint came from Maverick Management Group, LLC and not DEBTOR. These transfers were made using Debtor's funds going through Maverick Management Group, LLC.

**SPECIAL INTERROGATORY NO. 8:**

If the TRUSTEE's response to request for admission number 8 served with these interrogatories is not an unqualified admission, state all facts upon which the TRUSTEE bases his denial.

**RESPONSE:** Trustee did not deny Request for Admission No. 8. Upon reasonable inquiry, the information that the Trustee knows or can readily obtain is insufficient to enable it to admit or deny this Request.

**SPECIAL INTERROGATORY NO. 9:**

State all facts supporting the TRUSTEE'S allegation that the agreements debtor The Litigation Practice Group, P.C. ("**DEBTOR**") entered into with defendant JGW Solutions, Inc. ("**DEFENDANT**") that are attached to the complaint in this case are each an illegal capping agreement.

**RESPONSE:** See Response to Special Interrogatory No. 1.

**SPECIAL INTERROGATORY NO. 10:**

4

1
2

State all facts supporting the TRUSTEE'S allegation that at the time DEBTOR transferred money to DEFENDANT, DEBTOR was insolvent.

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

**RESPONSE:** **The Debtor's insolvency is evidenced, in part, by the 14 separate UCC-1 statements securing debts of Debtor as of September 1, 2022 and that these statements remained unreleased as of the Petition Date. These statements either reflected secured liens against Debtor's assets then owned or thereafter acquired or provided evidence of the assignment or sale of substantial portions of the Debtor's future income. When the Transfers to the Defendant were made by Debtor, these UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021 and December 1, 2021. Further responding, see attached 8:23-cp-01148-SC_000159-000163.**

21
22

**SPECIAL INTERROGATORY NO. 11:**

23
24

State all facts supporting the TRUSTEE'S allegation DEBTOR transferred monies to DEFENDANT that were supposed to be held in trust until earned.

25
26
27
28

**RESPONSE:** **The Trustee refers Defendant to the terms set forth in the Accounts Receivable Purchase Agreements that Defendant and Debtor entered into on November 7, 2022; November 17, 2022; January 23, 2023; February 28, 20923; and March 31, 2023; the bank statements produced in response to Defendant's**

1
2
3

**Request for Production No. 1; and the California Rules of Professional Conduct, which require legal fees paid in advance of legal services must be held in an identified trust account until the fee is earned.**

4

**SPECIAL INTERROGATORY NO. 12:**

5
6
7
8

State all facts supporting the TRUSTEE'S allegations that the effect of the Accounts Receivable Purchase Agreements between DEBTOR and DEFENDANT were to accomplish an unlawful purpose.

9

**RESPONSE: See Response to Special Interrogatory No. 1.**

10

**SPECIAL INTERROGATORY NO. 12:**

11
12
13
14

State all facts supporting the TRUSTEE'S allegations that the Accounts Receivable Purchase Agreements between DEBTOR and DEFENDANT violated federal law.

15
16
17
18
19
20

**RESPONSE: The transfers may be voided as fraudulent under 11 U.S. Code § 548 and 15 U.S.C. sec. 1679b (b), which prevents a credit repair organization from charging or receiving money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed. LPG's legal services agreement contains the following paragraph:**

21
22
23
24
25
26
27

> **You may request that LPG settle any debt identified below at any point in the course of LPG's representation of you. Where requested, LPG will negotiate the most favorable settlement it is able to negotiate on your behalf. Any settlement reached as a result of your request shall be your responsibility, and shall be paid directly from you to the creditor. At the point that you reach a settlement with a creditor, your payment to LPG will be reduced and to adjust for the settled account being removed from the representation herein contemplated. LPG will only settle a debt where litigation is active or contemplated.**

28

**This paragraph, coupled with taking money from a client trust account before completing the debt settlement work violates 15 U.S.C. sec. 1679b.**

<u>**SPECIAL INTERROGATORY NO. 13:**</u>

State all facts supporting the TRUSTEE'S allegations that the Accounts Receivable Purchase Agreements between DEBTOR and DEFENDANT violated California state law.

<u>**RESPONSE:**</u> **See Response to Special Interrogatory No. 1.**

<u>**SPECIAL INTERROGATORY NO. 14:**</u>

State all facts supporting the TRUSTEE'S allegation that at the time DEBTOR transferred money to DEFENDANT, DEBTOR was rendered insolvent.

<u>**RESPONSE:**</u> **See Response to Special Interrogatory No. 10.**


Dated: May 10, 2024                    DINSMORE & SHOHL LLP


By: <u>/s/ Sarah S. Mattingly          </u>
        Christopher B. Ghio
        Christopher Celentino
        Yosina M. Lissebeck
        Sarah S. Mattingly (pro hac vice*)*
        *Special Counsel to Richard A.*
        *Marshack, Chapter 11 Trustee*

**EXHIBIT "J"**

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)



| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Wells Fargo | Maverick Management Group LLC | ▮ | 3/31/2023 | 3/17/2023 | | 179,229.82 | WTFed#08351 morgan Chase Ban /Ftr/Bnf=Jgw Solutions LLC 9f# 0000960076600725 Trn#23031 7179496 Rib# |
| Chase | The Litigation Practice Group PC | ▮ | 2/28/2023 | 2/7/2023 | | 5,626.00 | Book Transfer Debit NC: Jgw Solutions LLC Irvine CA 92612-5647 US Ref: Weekly Disbursement Trn: 6644800038Jo |
| Bank of America | Litigation Practice Group PC | ▮ | 2/28/2023 | 2/1/2023 | | 211,073.78 | WIRE TYPE:WIRE OUT DATE:230201 TIME:1748 ETTRN20230201000535757 SERVICE REF495415 BNF:JGW SOLUTIONS LLC 10:863391 006 BNF BKJPMORGAN CHASE BANK. N. 1D0002 PMT DET:2CP9L87A9 POP Othe r |
| Chase | The Litigation Practice Group PC | ▮ | 1/31/2023 | 1/24/2023 | | 2,983.32 | Book Transfer Debit NC: Jgw Solutions LLC Irvine CA 92612-5647 US Ret Weekly Disbursement Tm: 0550500024Jo |
| Chase | The Litigation Practice Group PC | ▮ | 1/31/2023 | 1/24/2023 | | 9,459.52 | Book Transfer Debit NC: Jgw Solutions LLC Irvine CA 92612-5647 US Ret Weekly Disbursement Tm: 0550400024Jo |
| Chase | The Litigation Practice Group PC | ▮ | 1/31/2023 | 1/10/2023 | | 3,792.75 | Book Trsnster Debit NC: Jgw solutions LLC Irvine CA 92612-5647 us Ret Weekly Disbursement Tm: 4991 9000i0io |
| Chase | The Litigation Practice Group PC | ▮ | 1/31/2023 | 1/6/2023 | | 3,792.75 | Book Transfer Debit NC: Jgw Solutions LLC Irvine CA 92612-5647 US Ret Weekly Diabursement Tm: 471 5800006Jo |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/30/2022 | | 3,186.14 | Book Transfer Debit NC: Jgm Solutions LLC Irvine CA 92612-5647 US Ret Weekly Disbursement Tm: 5586900364J0 |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/27/2022 | | 3,811.26 | Book Transfer Debit NC: Jgw Solutions LLC Irvine CA 92612-5647 US Ret Weekly Disbursement Tm: 6979800361Jo |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/19/2022 | | 3,843.34 | Book Transfer Debit NC: Jgm Solutions LLC Irvine CA 92512-5647 US Ret Weekly Disbursement Tm: 8056700353Jo |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/9/2022 | | 2,953.62 | Book Transfer Debit NC: Jgw Solutions LLC Irvine CA 92612-5647 US Ret Weekly Disbursement Tm: 6580300343Jo |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/5/2022 | 12281 | 41,438.96 | File Purchase |
| Chase | The Litigation Practice Group PC | ▮ | 12/31/2022 | 12/5/2022 | | 4,966.66 | Book Transfer Debit NC: Jgw Solutions LLC Irvine CA 92612-5647 US Ret Weekly Disbursement Tm 5588900339Jo |
| Chase | The Litigation Practice Group PC | ▮ | 11/30/2022 | 11/25/2022 | | 2,465.96 | Book Tranuter Debit NC: Jgw Solutions LLC Irvine CA 92512-5647 US Ret Weekly Disbursement Tm. 42231 00329Jo |
| Chase | The Litigation Practice Group PC | ▮ | 11/30/2022 | 11/18/2022 | | 4,552.42 | Book Transtor Debit NC: Jgw Solutions LLC Irvine CA 92612-5647 US Ret: Weekly Disbursement Tm. 5037800322Jo |
| Chase | The Litigation Practice Group PC | ▮ | 11/30/2022 | 11/18/2022 | | 277.97 | Book Transfer Debit NC: Jgw Solutions LLC Irvine CA 92612-5647 US Ret File Purchase Tm: 51 5037700322Jo |
| Chase | The Litigation Practice Group PC | ▮ | 11/30/2022 | 11/15/2022 | | 118,794.96 | Book Transfer Debit NC: Jgw Solutions LLC Irvine CA 92612-5647 US Ret: Weekly Disbursement Tm 19700319Jo |
| Chase | The Litigation Practice Group PC | ▮ | 11/30/2022 | 11/10/2022 | | 3,501.86 | Book Transfer Debit NC: Jgw Solutions LLC Irvine CA 92612-5647 US Ret: Weekly Disbursement Tm 8054200314Jo |
| Chase | The Litigation Practice Group PC | ▮ | 11/30/2022 | 11/9/2022 | | 1,833.88 | Book Trenster Debit NC: Jgw Solutions LLC Irvine CA 92612-5647 US Ret: Weekly Disbursement Tm 4i58000313Jo |
| Chase | The Litigation Practice Group PC | ▮ | 10/31/2022 | 10/28/2022 | | 1,945.11 | Book Transfer Debit NC: Jgw 5olutions LLC Irvine CA 92612-5647 us Ref: Weekly Disbursement Tm: 739360030iJo |
| Chase | The Litigation Practice Group PC | ▮ | 10/31/2022 | 10/21/2022 | | 2,311.99 | Book Transfer Debit A/C: Jgw Solutions LLC Irvine CA 92612-5647 US Ret Weekly Disbursement Tm: 506i500294Jo |
| Chase | The Litigation Practice Group PC | ▮ | 10/31/2022 | 10/14/2022 | | 3,170.82 | Book Transfer Debit A/C: Jgw 5olutions LLC Irvine CA 92612-5647 us Ref: Weekly Disbursement Tm: 6304700287Jo |
| Chase | The Litigation Practice Group PC | ▮ | 10/31/2022 | 10/6/2022 | | 2,351.86 | Book Transfer Debit A/C: Jgw Solutions LLC Irvine CA 92612-5647 US Ret: Weekly Disbursement Tm: 4302200279Jo |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/30/2022 | | 234.98 | Book Transfer Debit A/C: Jgw Solutions LLC Irvine CA 92612-5647 US Ret: Weekly Disbursement Tm: 41 i0400273Jo |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/23/2022 | | 443.38 | Book Transfer Debit NC: Jgw Solutions LLC Irvine CA 92612-5647 us Ref: Weekly Disbursement Tm: 3099400266Jo |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/16/2022 | | 1,423.06 | Book Transfer Debit A/C: Jgw 5olutions LLC Irvine CA 92612-5647 US Ref: Weekly Disbursement Tm: 6652500259Jo |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/9/2022 | | 457.91 | Book Transfer Debit A/C: Jgw Solutions LLC Irvine CA 92612-5647 US Ret: Weekly Disbursement Tm: 3460600252Jo |
| Chase | The Litigation Practice Group PC | ▮ | 9/30/2022 | 9/2/2022 | | 335.24 | Book Transfer Debit A/C: Jgw Solutions LLC Irvine CA 92612-5647 U5 Ret: Weekly Disbursement Tm: 3723900245Jo |

DRAFT FORM - SUBJECT TO CHANGE

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | ▮ | 8/31/2022 | 8/26/2022 | | 634.43 | Book Transfer Debit NC: Jgw Solutions LLC Irvine CA 92612-1592 US Ref: Weekly Disbursement Tm: 4481500238Jo |
| Chase | The Litigation Practice Group PC | ▮ | 8/31/2022 | 8/19/2022 | | 197.16 | Book Transfer Debit NC: Jgw Solutions LLC Irvine CA 92612-1592 U5 Ref: Weekly Disbursement Tm: 2830900231Jo |
| | | | | | | **621,090.91** | |

DRAFT FORM - SUBJECT TO CHANGE

**EXHIBIT "K"**

In re: The Litigation Practice Group PC

Disbursement Details by Payee

90 Days Pre-Petition (12/20/2022 - 03/20/2023)

**GROBSTEIN TEEPLE**

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|-----------|--------------|----------------|----------------|------------------|--------------|--------------|------|
| Wells Fargo | Maverick Management Group LLC | ███ | 3/31/2023 | 3/17/2023 | | 179,229.82 | WTFed#08351 morgan Chase Ban /Ftr/Bnf=Jgw Solutions LLC 9f# 0000960076600725 Trn#23031 7179496 Rlb# |
| Bank of America | Litigation Practice Group PC | ███ | 2/28/2023 | 2/1/2023 | | 211,073.78 | WIRE TYPE:WIRE OUT DATE:230201 TIME:1748 ETTRN2023020100535757 SERVICE REF495415 BNF:JGW SOLUTIONS LLC 10:863391 006 BNF BKJPMORGAN CHASE BANK. N. 1D0002 PMT DET:2CP9L87A9 POP Othe r |
| Chase | The Litigation Practice Group PC | ███ | 1/31/2023 | 1/24/2023 | | 2,983.32 | Book Transfer Debit NC: Jgw Solutions LLC Irvine CA 92612-5647 US Ret Weekly Disbursement Tm: 0550500024Jo |
| Chase | The Litigation Practice Group PC | ███ | 1/31/2023 | 1/24/2023 | | 9,459.52 | Book Transfer Debit NC: Jgw Solutions LLC Irvine CA 92612-5647 US Ret Weekly Disbursement Tm: 0550400024Jo |
| Chase | The Litigation Practice Group PC | ███ | 1/31/2023 | 1/10/2023 | | 3,792.75 | Book Trsnster Debit NC: Jgw solutions LLC Irvine CA 92612-5647 us Ret Weekly Disbursement Tm: 4991 9000i0Jo |
| Chase | The Litigation Practice Group PC | ███ | 1/31/2023 | 1/6/2023 | | 3,792.75 | Book Transfer Debit NC: Jgw Solutions LLC Irvine CA 92612-5647 US Ret Weekly Diabursement Tm: 471 5800006Jo |
| Chase | The Litigation Practice Group PC | ███ | 12/31/2022 | 12/30/2022 | | 3,186.14 | Book Transfer Debit NC: Jgm Solutions LLC Irvine CA 92612-5647 US Ret Weekly Disbursement Tm: 5586900364J0 |
| Chase | The Litigation Practice Group PC | ███ | 12/31/2022 | 12/27/2022 | | 3,811.26 | Book Transfer Debit NC: Jgw Solutions LLC Irvine CA 92612-5647 US Ret Weekly Disbursement Tm: 6979800361Jo |
| | | | | | | **417,329.34** | |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
101 S. Fifth Street, Suite 2500, Louisville, Kentucky 40202

A true and correct copy of the foregoing document entitled (*specify*):**DECLARATION OF SARAH S. MATTINGLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 11/20/2024, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Alan W Forsley on behalf of Defendant JGW Solutions, LLC
alan.forsley@flpllp.com, awf@fkllawfirm.com,awf@fl-lawyers.net,addy@flpllp.com,andrea@flpllp.com

Marc A Lieberman on behalf of Defendant JGW Solutions, LLC
marc.lieberman@flpllp.com, addy@flpllp.com,andrea@flpllp.com

Marc A Lieberman on behalf of Interested Party Courtesy NEF
marc.lieberman@flpllp.com, addy@flpllp.com,andrea@flpllp.com

Richard A Marshack (TR)
pkraus@marshackhays.com, ecf.alert+Marshack@titlexi.com

Sarah S. Mattingly on behalf of Plaintiff Richard A. Marshack
sarah.mattingly@dinsmore.com

United States Trustee (SA)
ustpregion16.sa.ecf@usdoj.gov

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) 11/20/2024, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 11/20/2024, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**JUDGE'S COPY – VIA FEDEX**
The Honorable Scott C. Clarkson
U.S. Bankruptcy Court – Central District of California
Ronald Regan Federal Building and Courthouse
411 West Fourth Street, Suite 5130, Courtroom 5C
Santa Ana, California 92701-4593

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                      **F 9013-3.1.PROOF.SERVICE**

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 11.20.24 | Jamie Herald | /s/ Jamie Herald |
|----------|--------------|------------------|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                        **F 9013-3.1.PROOF.SERVICE**