1 | CHRISTOPHER CELENTINO (131688)
christopher.celentino@dinsmore.com
2 | YOSINA M. LISSEBECK (201654)
yosina.lissebeck@dinsmore.com
3 | CHRISTOPHER B. GHIO (259094)
christopher.ghio@dinsmore.com
4 | DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
5 | San Diego, California 92101
Tele:   619.400.0500
6 | Fax:   619.400.0501

7 | Sarah S. Mattingly (Ky. Bar 94257 – Admitted pro hac vice)
DINSMORE & SHOHL LLP
8 | 101 S. Fifth Street, Suite 2500
Louisville, KY 40202
9 | Telephone: 859-425-1096
Facsimile: 502-585-2207
10 | Sarah.mattingly@dinsmore.com

11 | *Special Counsel to Richard A. Marshack, former Chapter 11 Trustee for the Bankruptcy Estate of*
12 | *The Litigation Practice Group PC and current liquidating trustee of the LPG Liquidation Trust*

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE LITIGATION PRACTICE GROUP P.C.,<br><br>Debtor.<br><br>―――――――――――<br><br>RICHARD A. MARSHACK, Chapter 11 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>JGW SOLUTIONS LLC,<br><br>Defendant. | Case No. 8:23-bk-10571-SC<br><br>Chapter 11<br><br>Adv. Proc. No. 8:23-ap-01148-SC<br><br>**DECLARATION OF TONY DIAB IN SUPPORT OF SUPPLEMENTAL BRIEF** |

I, TONY DIAB, declare as follows:

1. At all relevant times I was an individual residing in the State of California. I have personal knowledge of the matters set forth herein and if called as a witness in this matter, I could and would testify competently thereto.

2. In February 2019, after being disbarred in both California and Nevada, I transferred my existing debt resolution practice to LPG.

3. LPG was a law firm that provided consumer debt resolution. LPG serviced more than 65,000 customers across the United States.

4. The consumers that retained LPG to represent them would pay over a period of time via monthly ACH debits from their bank accounts. The monthly payments were meant to cover all legal services LPG provided to the consumers. However, LPG mismanaged the consumers' monthly payments.

5. LPG collected ACH debits in the range of $250,000,000. The ACH debits should have been deposited into an IOLTA account until earned. Notwithstanding this requirement, substantially all of LPG's ACH debits were either deposited into LPG's operating account or transferred to non-debtor entities, insiders, affiliates, marketing companies and co-conspirators, including but not limited to: 1) $77 million to BAT through June of 2022; 2) substantial amounts were paid to marketing and affiliate companies, some of which I controlled and/or was an insider of; 3) substantial business expenses paid in cash; 4) payments for unnecessary and unrelated personal luxury expenses, including but not limited to sports cars, private jets to Vegas, resorts and luxury hotels, a BMW i8, Mercedes Benz G-Wagon, a luxury box suite at the Anaheim Ducks arena, and luxury watches, among other examples; and 5) other fraudulent transfers to myself and my co-conspirators and other insiders and their affiliated entities for their role in the fraudulent scheme. All of which rendered LPG insolvent requiring LPG to continue to improperly sell ACH debits multiple times over, and to incur new debt in a "Ponzi Scheme" to finance LPG's continued and extravagant existence.

6. Historically, LPG had a business partner called BAT Inc. d/b/a Coast Processing ("Coast Processing"), which was owned by Brian Reale ("Reale"), Arash Asante Bayrooti ("Bayrooti"), and me. Mario Azevedo later received a small ownership percentage in this entity. Coast

1

Processing was one entity through which LPG ran its in-house marketing and client development operations, among other operational functions at LPG such as backend processing.

7. LPG, however, also had a network of over 100 marketing affiliates from which LPG obtained new clients.

8. In 2021, I bought out the other owners of Coast Processing and merged its operations with LPG, including Coast Processing's contracts with other marketing affiliates.

9. Despite Coast Processing's operations being merged into LPG, Coast Processing exists as a California corporation in good standing. At all relevant times prior to the buyout, Coast Processing exercised authority, dominion and control over LPG in concert with myself, and at times used the dba "LPG." I am the current chief executive officer, chief financial officer and secretary of Coast Processing.

10. Marketing affiliates referred clients to LPG. In order to generate these clients, most of the marketing affiliates placed web-ads seeking consumers who had debt problems or purchased lists of potential clients that they would feed through an automated dialer. The marketing affiliates located clients who were seeking debt relief services. After capturing the consumers on behalf of LPG, LPG paid the marketing affiliates a percentage of the monthly payments made by the consumers.

11. LPG's consumers paid fees to LPG over a period of time, ranging from 12 to 36 months, through monthly debits from their bank accounts. The monthly debits were controlled by myself, LPG, and, at times, other entities, including Coast Processing, over whom I had control, influence and/or had conspired to continue to obtain and direct funds from LPG's consumers. Each set of payments received or due by a consumer is referred to as an "ACH debit" or "ACH Receivables."

12. Because LPG and its marketing affiliates received only incremental payments over time, LPG would often transfer the future cash flow of consumer payments or work with the marketing affiliates receiving a portion of the monthly consumer payments to transfer their future cash flow to investors, as well as to MCA Lenders/factoring companies, at a discounted rate. The companies that received the ACH Receivables from LPG or its marketing affiliates on account of these files often received a return equal to the difference between the amount the clients owed on the file and the amount paid for the file or a percentage thereof. At all relevant times, LPG understood that

2

the receivables being transferred by LPG or by a marketing affiliate of LPG were LPG receivables that consisted of LPG client payments pursuant to agreements the clients had with LPG.

13. LPG transferred ACH Receivables and the associated client files in this fashion to defraud creditors in a pyramid scheme and for improper personal gain.

14. LPG's monthly revenue from client files was primarily received via ACH payments. To process ACH payments, LPG was required to enlist the services of ACH payment processing companies who handle high risk transactions. In this regard, I had enlisted numerous ACH processing companies to easily switch between different vendors and have millions of dollars of LPG funds directed to entities I controlled, including but not limited to Vulcan Consulting Group ("Vulcan"), Maverick Management Group LLC ("Maverick"), Prime Logix, LLC ("Prime Logix"), LGS Holdco, LLC ("LGS"), and/or Coast Processing. I utilized these other entities' bank accounts as LPG bank accounts.

15. The ACH processing companies LPG used, which I had control over, included, but were not limited to, EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited; Marich Bein; R3volve; FIS; BCB Bank; and Guardian.

16. The largest investor to have purchased LPG ACH Receivables on account of LPG's client files is Validation Partners, LLC ("Validation Partners").

17. Between August 30, 2021, and August 17, 2022, Validation Partners spent $66,000,000 to purchase Accounts Receivables from LPG and 58 of LPG's marketing affiliates. In total, Validation Partners purchased over 40,000 accounts from LPG and its affiliates with a total future value greater than $400,000,000.

18. Pursuant to the asset purchase agreement between LPG and Validation Partners, I instructed Validation Partners to deposit a portion of the funds generated by the sale of Accounts Receivable into the LPG account.

19. I also instructed other lenders and file purchasers to divert LPG loan proceeds or to deposit money otherwise due to LPG into bank accounts I controlled on behalf of LPG but ostensibly held by Vulcan, Maverick, Prime Logix, LPG and/or Coast Processing. I used all of these proceeds as if they were LPG funds, because they were.

20. I also instructed Validation Partners to directly utilize LPG Accounts Receivables and transfer those funds to various affiliates and/or make deposits into LPG accounts.

21. At or around the Petition Date, I transferred or sold approximately 15,000 LPG client files to Oakstone, 12,000 LPG files to CLG, and the remaining LPG files, approximated at slightly less than 40,000, to Phoenix.

22. Pursuant to the asset purchase agreement between LPG and CLG, I instructed CLG to initiate the ACH debits on the transferred files, which it did through Optimum Bank and its processing entity LGS Holdco.

23. At or around the Petition Date, I transferred, for no consideration, approximately 8,000 files (previously transferred to Phoenix) to Heshy Deutsch and Israel Reiches. I instructed Heshy and Israel, by and through their co-conspirators Sam Geiger and Solomon Feig, to initiate the ACH debits on the transferred files, which they did through BCB Bank and a processing entity known as CLG Processing, into accounts, not in the name of LPG, but that held funds of behalf of LPG and disbursed those funds for LPG.

24. The funds obtained from the ACH debits described in paragraphs 22 and 23 above were deposited in Maverick and Prime Logix accounts, among others.

25. LPG's ACH Receivables were the primary, if not exclusive source of funds, for Validation Partners, Vulcan, Oakstone, PECC, Prime Logix, Coast Processing, LGS and Maverick. As set forth above, the other sources of funds for these entities are the proceeds of LPG assets (i.e., file purchase account receivable proceeds) or constitute loan proceeds for which LPG alone was liable.

///

///

///

///

///

///

///

///

4

26. I frequently diverted the LPG money pulled from its consumer clients and other funds it received through investors and lenders, to and through these entities. I frequently would direct these entities to pay affiliates (aka marketing cappers), MCA lenders, and others with LPG assets. I would instruct others at LPG and these entities on how to manage and transfer these funds to and from these entities and LPG interchangeability.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

February 25, 2025

_____
Tony Diab

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
101 S. Fifth Street, Suite 2500, Louisville, Kentucky 40202

A true and correct copy of the foregoing document entitled (*specify*):

**DECLARATION OF TONY DIAB IN SUPPORT OF SUPPLEMENT BRIEF**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) March 3, 2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Sarah S. Mattingly on behalf of Plaintiff Richard A. Marshack sarah.mattingly@dinsmore.com
Richard A Marshack (TR) pkraus@marshackhays.com, ecf.alert+Marshack@titlexi.com
United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) March 3, 2025, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

JGW Solutions, LLC
Jonathan Jenkins
2600 Michelson Dr., #16000
Irvine, CA 92612

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) March 3, 2025, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**JUDGE'S COPY – VIA FEDEX**
The Honorable Scott C. Clarkson
U.S. Bankruptcy Court – Central District of California
Ronald Regan Federal Building and Courthouse
411 West Fourth Street, Suite 5130, Courtroom 5C
Santa Ana, California 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 3, 2025 | Jamie Herald | /s/ Jamie Herald |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                                    F 9013-3.1.PROOF.SERVICE